THE TRUSTEES OF AMHERST COLLEGE et al., Respondents, *v.* THOMAS G. RITCH et al., Individually and as Trustees and Executors, etc., of DANIEL B. FAYERWEATHER, Deceased, et al., Appellants.

1. DECISION WITHOUT FINDINGS — APPEAL — FACTS PRESUMED FOUND. Where the decision of a trial court or referee does not state the facts found (Code Civ. Pro. § 1022), and the judgment entered thereon has been affirmed by the General Term, upon an appeal to the Court of Appeals all the facts warranted by the evidence and necessary to support the judgment are presumed to have been found; and the Court of Appeals in such case has no more control over the facts than when specific findings have been made and affirmed.

2. QUESTION OF FACT — FRAUD. One standing in no fiduciary relation to another, who neither withholds nor misstates the facts, cannot be adjudged guilty of fraud because he does not disclose his opinion; and hence it cannot be said in such case that the alleged fraud was so conclusively proved as not to involve a question of fact, simply because the courts finally decide the law to be other than he claimed it to be while engaged in litigation over the subject.

3. LEGACY IMPRESSED WITH SECRET TRUST. If a testator is induced to make an apparently absolute legacy, by a promise, express or implied, on the part of the legatee that he will devote his legacy to a certain lawful purpose, a secret trust is created, and equity will compel the legatee to apply property thus obtained by him in accordance with his promise.

4. LEGACY TO TENANTS IN COMMON — SECRET TRUST. The fact that a legacy is to three persons as tenants in common, and not as joint tenants, does not prevent a secret trust being imposed upon the shares of all the legatees by a promise to carry out the purpose of the legacy, made to the testator by two of the legatees on behalf of themselves and their associate, when the legacy was made in reliance upon such promise and all the legatees obtain their rights through the result accomplished by the promise.

5. RESIDUARY LEGACY IMPRESSED WITH SECRET TRUST TO DISTRIBUTE AMONG DESIGNATED COLLEGES. If a testator, after making a will containing specific bequests to certain colleges, each capable of asserting itself as a definite beneficiary, and giving the residuary estate to two executors in trust to convert into cash and distribute equally among the same colleges, makes a codicil revoking the original residuary clause and giving the residuary estate absolutely to the individuals named in the will as executors, followed by a codicil adding a third person as executor, and by a final codicil confirming the revocation of the residuary clause of the will and amending the first codicil by giving the residuary estate absolutely to the three individuals theretofore named as executors, all

such codicils being in fact based upon a continuing promise on behalf of the residuary legatees to distribute the residuary estate among the colleges named in the will — a secret trust is constituted for the benefit of the colleges named in the will, which (in the absence of any applicable statutory limitation upon the amount of testamentary gifts to literary corporations) may be enforced by them in equity; and the residuary legatees cannot, by deed of gift or otherwise, devote any of the residuary estate to institutions not definitely designated by the testator as beneficiaries of the trust.

6. LIMITATION OF TESTAMENTARY GIFTS TO LITERARY CORPORATIONS — L. 1860, CH. 360. The act (L. 1860, ch. 360) which prohibits a person, having a husband, wife, child or parent, from giving by will more than one-half of his or her estate to charitable or literary corporations, applies to a secret trust impressed upon a testamentary gift, when the trust is a manifest evasion of the statute, at least until all intervening rights derived from the statute have been lawfully cleared away.

7. L. 1860, CH. 360. Only the persons named in chapter 360, Laws of 1860, and those benefited through them, can invoke its protection; and its protection can be waived or relinquished by those entitled thereto.

8. RELEASE OF STATUTORY LIMITATION UPON AMOUNT OF TESTAMENTARY GIFT — SECRET TRUST. When the trustees of residuary property, given to them in form absolutely by the will of a testator having a wife and next of kin, but actually impressed with a secret trust for the benefit of certain definite literary corporations designated by the testator, and exceeding one-half of the testator's estate, have assumed to dispose of the property in violation of the secret trust, the effect of a settlement of their own claims by the widow and next of kin with the trustees, and a cancellation or transfer of the same by releases to the trustees, is to revive the secret trust relieved from the operation of chapter 360, Laws of 1860.

9. EQUITABLE ESTOPPEL. The claim that the beneficiaries of a secret trust, created by a testator in favor of certain literary corporations, and exceeding one-half of his estate, are estopped in equity by reason of keeping silent concerning their intention of enforcing the trust, while promoting a settlement with the widow and next of kin of the testator by which the claims of the widow and next of kin upon the trust property were satisfied and released, is not established where the facts show that the acts of the beneficiaries are to be construed merely as a consent to the payment of a certain sum out of the trust property to the widow and next of kin, and not to the settlement as such.

10. RES ADJUDICATA — PROCEEDING UNDER COLLATERAL INHERITANCE ACT. An adjudication by a surrogate, in a proceeding under the Collateral Inheritance Act instituted to ascertain what amount of property passing under a will was subject to taxation, and to fix the amount of the tax, that a certain amount of property passed to residuary legatees

under the will, is binding upon the question of taxation only, and is not conclusive upon the rights of parties arising from matters outside the will.

　　*Trustees* v. *Ritch*, 91 Hun, 509, affirmed.

(Argued December 1, 1896; decided January 19, 1897.)

Appeal from a judgment of the General Term of the Supreme Court in the first judicial department, entered December 30, 1895, which affirmed a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

Daniel B. Fayerweather, an old resident of the city of New York, died on the 15th of November, 1890, leaving a will, four codicils, an estate of several millions, consisting chiefly of personal property, and debts amounting to less than $10,000. He left neither child nor descendant, but a widow and three nieces, his only heirs at law and next of kin, survived him. By the first and second articles of his will, which is dated October 6, 1884, he revoked all prior wills by him made and provided for the payment of his debts, funeral expenses and the costs and charges attending the administration of his estate. By the third article he bequeathed to his wife the sum of $10,000, and by the fourth he devised to her his dwelling house and the furniture therein, his stable, horses, carriages and the like. By the fifth article he gave his wife an annuity of $15,000 during her life and directed that the provisions in his will for her benefit should be in lieu of dower or other interest in his estate.

By the sixth article he gave to Anna Amelia Joyce an annuity of $1,000 during her life, or so long as she should remain unmarried, and by the seventh he gave to Lucy J. Beardsley $100,000; to Mary W. Achter and Emma S. Drury $10,000 each, and to Charles Hennessey, a porter in his store, $1,000.

The eighth, ninth and tenth articles are as follows:

"*Eighth.* After the payment of the legacies and bequests hereinbefore made, I give and bequeath to the Presbyterian Hospital, located in the city of New York, the sum of $25,000. To St. Luke's Hospital, in said city, $25,000. To the Man-

hattan Eye and Ear Infirmary, in said city, $25,000. To the Women's Hospital, in said city, $10,000. To Mount Sinai Hospital, in said city, $10,000.

"*Ninth.* Subject to the conditions and limitations in this paragraph hereinafter contained : I give and bequeath to Bowdoin College, at Brunswick, Maine, the sum of $100,000. To Dartmouth College, at Hanover, New Hampshire, the sum of $100,000. To Williams College, at Williamstown, Massachusetts, the sum of $100,000. To Amherst College, at Amherst, Massachusetts, the sum of $100,000. To Wesleyan University, at Middletown, Connecticut, $100,000. To Yale College, at New Haven, Connecticut, $300,000, of which $100,000 shall be used for the purposes of the Sheffield Scientific School, connected with said college. To Columbia College, in the city of New York, $200,000. To Union Theological Seminary, in the city of New York, the sum of $50,000 as a special fund, to be used for the endowment of what are known as cadetships, such use, however, being subject to the discretion of the board of directors of such institution. I also give and bequeath unto Hamilton College, at Clinton, New York, $100,000. To the University of Rochester, at Rochester, New York, $100,000. To Cornell University, at Ithaca, New York, $200,000. To Lafayette College, at Easton, Pennsylvania, $50,000. To Lincoln University, at Lower Oxford, Pennsylvania, $100,000. To the University of Virginia, at Charlotteville, Virginia, $100,000. To Hampton University, at Hampton, Virginia, $100,000. To Maryville College, Maryville, Tennessee, $100,000. To Marietta College, at Marietta, Ohio, $50,000. To Adelbert College, at Cleveland, Ohio, $50,000. To Wabash College, at Crawfordsville, Indiana, $50,000. To Park College, at Parkville, Missouri, $50,000. In case the condition and circumstances of any of the institutions named in this paragraph of my will shall be so changed that, in the judgment of my executors, it is not expedient to pay over all or any of said moneys to such institutions, I authorize and empower my executors, in the exercise of their discretion, to withhold or reduce the amounts

herein directed to be given. If my estate shall not be sufficient to pay in full all the legacies and bequests in this, my will, contained, the legacies and bequests provided for prior to this paragraph of my will shall be first paid in full, and the bequests in this paragraph contained shall be paid *pro rata.*

" *Tenth.* All the rest, residue and remainder of my estate, real and personal, of which I shall die possessed, I give, devise and bequeath unto my executors, to have and to hold the same, in trust nevertheless, to sell and convert into cash and divide the same equally among the several corporations mentioned in the ninth paragraph of this, my will, share and share alike."

By the eleventh and last article he appointed Justin L. Bulkley and Thomas G. Ritch, executors of his will and trustees of his estate, with authority to sell and convey, and to do any and all acts in their discretion expedient or necessary to the full execution of the provisions of his will.

Anna Amelia Joyce, who is named in the sixth article, was a sister of Mrs. Fayerweather and lived in the family of the testator, for whom she occasionally acted as an amanuensis. She subsequently married and is now Mrs. John B. Reynolds. Lucy J. Beardsley, Mary W. Achter and Emma S. Drury, mentioned in the seventh article, are the heirs at law and next of kin of the testator. Mrs. Drury, having obtained a divorce, resumed her maiden name and is now known as Emma S. Fayerweather. The property given to the widow by the fourth clause of the will was worth about $100,000. In early life Mr. Fayerweather spent some time in the neighborhood of the University of Virginia and his experience and associations at that time awakened an interest in college education. His instructions to Mr. Thomas G. Ritch, his legal adviser, who drew this will, were that he wished to dispose of his property in the same general way as in previous wills made by him. In 1875 he executed a will, the contents of which were not disclosed by the evidence, except that it showed an interest in educational institutions. This interest appeared more plainly in a will made in 1880, by which he gave

$1,600,000 to fourteen colleges, including twelve of those named in the ninth article of the will that is now the subject of controversy. The residuary clause of the will of 1880 was substantially like the tenth article of his last will made in 1884, except that the beneficiaries were the same fourteen colleges to which he had given specific legacies to the amount of $1,600,000, as aforesaid.

On the same day that the will in question was executed the testator signed a paper of even date, the body of which is as follows :

" This certifies that I have executed my will of this date, having been advised by my counsel of the provisions and restrictions of the law of this state relative to benevolent corporations. I trust my heirs will permit the provisions of this, my will, to be carried into effect."

Both the will and this paper were prepared under the direction of Mr. Ritch, and were given to him for safe-keeping as soon as they were executed. The only statutes of this state imposing restrictions upon the disposition of property that are applicable to this will are chapter 319 of the Laws of 1848, as amended, which relates to the amount of property that benevolent corporations can receive by devise, and chapter 360 of the Laws of 1860, which forbids a testator, having a wife, child or parent, to give more than one-half of his estate to charitable, benevolent or literary institutions. The bequests to the five hospitals named in the eighth clause amount to $95,000, while those to the twenty colleges named in the ninth clause amount to $2,100,000, so that, under the operation of the statute last named, the tenth clause of the will was valid only to the extent of the difference between $2,195,000 and one-half of the estate remaining after the payment of debts.

About two months after he made his will Mr. Fayerweather executed his first codicil, dated December 13, 1884, the disposing part of which is in these words :

" I. I hereby ratify and confirm my said will in every respect, except so far as the same is modified by this codicil.

" II. I hereby revoke the tenth paragraph of my said will,

which is in the words following : (That paragraph was here quoted literally and inclosed by quotation marks.)

"III. All the rest and residue of my estate, of whatsoever character and wheresoever situated the same may be, of which I shall die possessed and remaining after the provisions of the first nine paragraphs of my will have been duly complied with and carried into effect, I give, devise and bequeath to Justus L. Bulkley and Thomas G. Ritch, named in the eleventh paragraph of my said will, to them and their heirs forever."

Mr. Ritch, who prepared this codicil, also prepared a paper which was substantially copied by the testator and signed by him, bearing the date of December 11th, 1884, and headed "Private Memorandum," of which the following is a copy : "I have made Messrs. Bulkley and Ritch my residuary legatees, in the confidence that thereby my intentions as expressed in my will shall be carried into effect, and without litigations on the part of any person or persons interested. In case of my death I trust they will take such steps, by will or otherwise, as will protect my estate against the contingency of the death of either before my estate is settled and distributed." This paper was placed in an envelope, which was indorsed "Messrs. J. L. Bulkley and T. G. Ritch, to be opened in case of my death," and was handed by Mr. Fayerweather, together with the codicil, to Mr. Ritch for safe-keeping.

Several years passed when, on the 7th of January, 1888, Mr. Fayerweather executed a second codicil to his will, by which, after making some bequests to persons employed by his firm, he provided as follows :

"*Second.* I hereby nominate and appoint my friend, Henry B. Vaughan, of Elizabeth, New Jersey, an executor of my will and trustee of my estate, in addition to Justus L. Bulkley and Thomas G. Ritch, named as executors and trustees in my said will, and I give to said Vaughan the same powers and authority in every respect as are conferred on said Bulkley and Ritch in and by the eleventh paragraph of my will. I order and direct that no bonds or other security of any kind be required to be given by him as executor or trustee.

" *Third.* In all respects, except as herein modified, I ratify and confirm my said will and the first codicil thereto."

Fourteen months later, and on March 19, 1884, he executed a third codicil, whereby he increased the amount of the legacies previously given to Anna Amelia Joyce, Mary W. Achter and Emma S. Drury, provided for the purchase of a burial lot and the erection of a monument, and made bequests to a number of persons in his employment.

There were several interviews between the testator and his said counsel a short time before the execution of the third codicil, during which the private memorandum dated December 11, 1884 was produced by Mr. Ritch and placed before Mr. Fayerweather. In the course of these interviews another paper was signed by Mr. Fayerweather and left with Mr. Ritch, dated March 22, 1889, of which the following is a copy:

" Private memorandum. Having made inquiries with regard to Hampton and Lincoln Universities, it is my judgment that the bequests to them should be withheld. I think the bequest to Cornell University should not exceed $100,000. If the Northwestern University, at Evanston, Illinois, is in a prosperous condition I should recommend that $100,000 be given to it. If the following persons are in my employ at the time of my death I suggest that they receive the following sums: Rogers and Clark $500 each; Gould, Campbell and Stone $300 each, and Carpenter $250; also James, who now opens and closes the store, $100; John Dixon, $200. I also wish that $1,000 be given to Miss Joyce immediately after my decease, in addition to the provision made for her by my will."

Mr. Ritch testified that when this paper was signed several suggestions were made to him by Mr. Fayerweather in relation to various colleges named in the ninth article of his will, and, speaking " generally with regard to institutions," he said to Mr. Ritch, in substance, that he and Mr. Bulkley must use their best judgment in regard to what came into their hands.

About a year and a half later, and after Mr. Fayerweather's

health had begun to fail, he wrote a note to Mr. Ritch dated November 3d, 1890, requesting him to bring him "the balance of the copy of" his "will," doubtless referring to the second and third codicils, and Mr. Ritch did so about four days later. November 10th, 1890, Mr. Vaughan, who had been appointed by the second codicil as one of the executors and trustees, but who was not then a legatee or devisee, had an interview with Mr. Fayerweather, who produced a copy of the will and three codicils, which Mr. Vaughan read aloud to him at his request. Until then Mr. Vaughan did not know that the residuary estate had been given to Messrs. Bulkley and Ritch, and he didn't even then learn of the three memoranda above referred to. He knew that Mr. Fayerweather wanted his residuary estate to go to institutions, and in view of the absolute nature of the residuary gift he entertained some misgivings as to what might become of it. He asked an explanation from Mr. Fayerweather, who said that he believed his wishes would be carried out. As a result of the conversation Mr. Vaughan went to his lawyer, Mr. Prescott Hall Butler, who prepared another codicil, revoking the devise and bequest of the residuary estate made to Messrs. Bulkley and Ritch, individually, by the first codicil and restoring the tenth article of the will. On the same day Mr. Vaughan read the draft of this codicil to Mr. Fayerweather, who approved it, and the next day executed it and placed it in the hands of Mr. Vaughan for safekeeping. Mr. Ritch knew nothing about this. On the 13th of November, 1890, Mr. Vaughan had another interview with Mr. Fayerweather, during which two letters were signed by the latter and given to the former to be delivered to Mr. Ritch, one after the other, as if the second had not been written until after the first had been answered. In the first of these letters, which was in the handwriting of Miss Joyce, he requested Mr. Ritch to deliver to Mr. Vaughan the original will and the first, second and third codicils thereto, stating that he wished to examine them with Mr. Vaughan in connection with the copies already furnished. In the second letter, which was written by Mr. Vaughan, but signed by Mr. Fayerweather, the

latter said : "I have examined my original will and the first, second and third codicils thereto handed by you to Mr. Vaughan at my request.   By the tenth article of my will I left my residuary estate to my executors in trust, to be equally divided among certain corporations and institutions.   By the first codicil it seems that I revoked this tenth article of my will, and then made the following disposition of my residuary estate," quoting in full the devise made by the third paragraph of the first codicil to Messrs. Bulkley and Ritch.   "Please advise me at once in writing what is the legal effect of this clause, and to whom and how would my residuary estate go in case of my death, supposing this first codicil to remain in force."   On the same day Mr. Vaughan delivered the first letter to Mr. Ritch, received from him the will and codicils called for, and told him that Mr. Fayerweather was too ill to be seen, although he had himself seen him and transacted business with him that day, but he retained in his possession the second letter until the next day, when he delivered that also.   Mr. Ritch at once dictated to his typewriter and read to Mr. Vaughan a letter to Mr. Fayerweather, saying : "The intention of the change in question was to enable Mr. Bulkley and myself to carry out the intentions of the will as modified by the various private memoranda in my possession.   Neither Mr. Bulkley nor myself would have any moral right to treat any portion of your estate otherwise than as we know would conform to your wishes.   I suggest that I call on you with these, and, if still approved by you, that they be left in a sealed package with Miss Joyce, or any one named by you. The legal effect of the clause in question is to vest the title to the residuary estate in Messrs. Bulkley and myself ; but, as I have said, neither Mr. Bulkley nor I would wish to derive any personal benefit under this codicil."   Mr. Vaughan thereupon asked what those private memoranda were, and Mr. Ritch had copies prepared and handed them to him, and he took them away with the letter.   On the same day Mr. Ritch, who, during all this time, knew nothing of the Butler codicil, wrote a letter to Miss Joyce, in which he stated : "I have had two

long talks with Mr. Vaughan to-day and yesterday, and I fear Mr. Fayerweather is worrying over his business matters. Mr. Vaughan says that Mr. F. is too ill to be seen, and so I would be glad to have you say to him, if you think it well, that I will execute any paper, or say anything in your presence, or in that of any one else, that will enable him to feel that his wishes will be carried out to the letter. It would be a misfortune, indeed, to me to lose his confidence after so many years through any misunderstanding now. The will and codicils provide carefully for the institutions in which he was interested, and for the relatives and friends to whom he was attached, and I know that at the time the papers were drawn the reasons for each paragraph were considered and approved by him, the object being to prevent any contests. I write thus freely to you, because you have known of Mr. Fayerweather's affairs, and I believe that you, as well as he, believe that I have only tried to do my duty. If at any time you or Mr. F. would like to see me, I will call." This letter was received by Miss Joyce early in the evening of the same day, and immediately after reading it herself she read it to Mr. Fayerweather, who requested her to hand it to Mr. Vaughan, and she did so the next morning. At the same time she read to him a letter written to her that day by Mr. Vaughan, which omitting date, address and signature, is as follows :

"Will you please explain to Mr. Fayerweather that I obtained the papers from Mr. Ritch. At first Mr. Ritch stated that he would take the papers to Mr. F., but I reminded him that the letter read to give them to me, and he said he would do it. He grew as white, however, as the paper upon which I am writing. I will deliver the second letter to-morrow. There is, however, but little use of this, as I am convinced from his manner that Mr. Ritch knew exactly what he was doing."

On the next day, which was Saturday, November 15th, Mr. Vaughan called upon Mr. Fayerweather at about 10 o'clock in the forenoon and remained with him until between eleven and

twelve. During this period they conversed about another codicil, and Mr. Vaughan was instructed to have one prepared. Mr. Vaughan testified that he did not show the letter which Mr. Ritch had given him for Mr. Fayerweather, or acquaint him with its contents, or even disclose its existence, and that, instead of telling what had taken place between himself and Mr. Ritch, he told him that the latter was "all right." Although he had with him copies of the private memoranda that he had obtained from Mr. Ritch, he did not so inform Mr. Fayerweather. He further testified that he made a memorandum upon the envelope containing the private memoranda above referred to, of which the following is a copy : " Clause about Miss Joyce. About the men being with him. More institutions for benefit. Mrs. Beardsley, amount $100,000 in bonds. Strike out about servants in his employ." This, according to Vaughan's statement, was a record of the suggestions made by Mr. Fayerweather, who carried out one of them at once, by writing a letter to Mr. Myrick, his confidential man of business, directing him to give $100,000 in certain securities to Mrs. Lucy J. Beardsley, which was done forthwith. Mr. Fayerweather, as Mr. Vaughan says, referred to his competency in selecting institutions for benefit, and stated that he was not very well fitted for that work ; that he had used his best endeavors and obtained the best advice that he could get, but there would have to be others found to whom the rest of the money should be given and that further selections would have to be made. Although Mr. Vaughan testified that this conversation and others of like character were had during that forenoon, and that he then made the memorandum on the back of the envelope, he never disclosed either fact until the trial of this action, although there were prior occasions when it was his duty to do so.

At this time it was supposed that Mr. Fayerweather, although far gone with consumption, would live until spring, but Dr. Vedder, the attending physician, who called at about 12 o'clock, told Mr. Vaughan that if there were any papers which he wished Mr. Fayerweather to sign, he had better

have him sign them at once; that Monday would not answer, but "they had better be done" that day. Mr. Vaughan at once went to Mr. Ritch's office and had another codicil prepared, now known as the fourth, and returned with it to Mr. Fayerweather's house between one and two o'clock in the afternoon, when it was executed. Omitting the formal parts, it is as follows:

"*First*. In all respects, except as hereinafter modified, I ratify and confirm my said will and the codicils thereto.

"*Second*. I hereby confirm the revocation of the tenth paragraph of my said will.

"*Third*. I hereby amend and change the third paragraph of the codicil dated and made Dec. 13, 1884, so as to read as follows: ' All the rest and residue of my estate, of whatsoever character and wheresoever situated the same may be, of which I shall die possessed and remaining after all the specific legacies in my said will and the several codicils thereto have been paid and all the provisions of said will and codicils have been fully complied with and carried into effect, I give, devise and bequeath to Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, to them and their heirs forever.' "

About an hour after the execution of this codicil Mr. Vaughan, by direction of Mr. Fayerweather, given by a nod of the head in response to a question, caused the codicil prepared by Mr. Butler and executed on the eleventh to be destroyed. He did not disclose the fact of the execution of that codicil until after Mr. Fayerweather's death, nor did he fully disclose the contents of it until the trial of this action. Mr. Vaughan also testified that after the execution of the fourth codicil Mr. Fayerweather said to him that "We were to put our heads together and find some other places for the money," although upon another legal proceeding when testifying upon the same subject he omitted the word "other." Miss Joyce testified that she was in Mr. Fayerweather's room at all times while Mr. Vaughan was there on this occasion and that no such remark was made. Not long after the execution of the last codicil Mr. Fayerweather became *in articulo*

*mortis*, lingered a few hours and died that night.   Mr. Ritch testified that, although he had a thorough knowledge of Mr. Fayerweather's wishes in respect to his estate, he never mentioned to him the name of any institutions outside of the will and codicils and the memorandum of March 22, 1889, as objects to which he desired to make a gift, nor did he ever express any wish to have his property given to the colleges and hospitals to whom the executors afterward transferred a large portion of it by a so-called " deed of gift," hereinafter described.   He also testified that he never told Mr. Fayerweather that he would not carry out his wishes as expressed in the will.

The executors promptly presented the will and codicils for probate, but the widow and nieces filed objections based upon the usual grounds of defective execution, unsound mind, undue influence and fraud.   The contestants were represented by Mr. Frederick R. Coudert, Mr. Daniel G. Rollins and others.   The trial of the issues began on the 2d of February, 1891.   The notes, letters and memoranda were read in evidence, Messrs. Ritch, Vaughan and others examined as witnesses, and on the 17th the surrogate announced his intention to admit the will to probate, leaving the contest over the codicils to continue.   On the 14th of February, 1891, Mr. John E. Parsons, who represented the residuary legatees, wrote to Mr. Coudert that Messrs. Bulkley, Ritch and Vaughan did not intend to retain for their " personal purposes " the residuary estate.   On the 24th of the same month the residuary legatees executed an instrument known in this controversy as the deed of gift, whereby, after reciting that they were prompted by the determination not to retain for their own use any part of the residuary estate left to them by the will, and by the desire to make such use of the residuary estate as in their judgment would best honor the memory of Mr. Fayerweather, they disposed of the same as follows:   They reserved the power to make and retained the right to assent to any enlargement of the provisions made by the will for Mrs. Fayerweather, Mrs. Achter and Mrs. Drury, in case they

should be satisfied that such enlargement would not be against the wishes of Mr. Fayerweather. They gave Mrs. Beardsley $100,000, to Miss Joyce and others certain amounts, including the sum of $100,000 to the Northwestern University. They then gave $465,000 to eleven hospitals, including the sum of $200,000 additional to the Women's Hospital. To twenty-one colleges they gave $1,570,000, and directed that the amount in each case should be used as a Fayerweather fund in some distinctive manner, either for the erection of buildings, the establishment of scholarships or other use which, in the judgment of the authorities, would be of the greatest practical benefit ; but the mode of use was to be subject to the approval of the donors. All the rest of the residuary estate, after payment in full of the foregoing, they divided into ten parts and gave five to the Women's Hospital, one to the Presbyterian Hospital and one to each of four colleges, two of which were named in the will. They closed the instrument as follows : " We execute this instrument, recognizing that there is pending a contest in proceedings for the probate of Mr. Fayerweather's will, and recognizing, further, that if such contest shall not prevail, a question may be made about our legal rights as devisees and legatees. We assume no responsibility for the result of such contest, or of any such question, or for the acts or omissions of each other, or for the amount of or title to any of said residuary estate. Our object is each for himself to give away whatever may come to us as residuary devisees and legatees under Mr. Fayerweather's will. This instrument is to have only that effect. To make the same as effectual as we can, we deliver this instrument to Stephen P. Nash, Esq., of the city of New York, and Hon. Henry Stoddard, of New Haven, Conn., to hold for the said donees.

" In witness whereof we have hereunto set our hands and seals, and we, the said Henry Stoddard and Stephen P. Nash, in evidence of our acceptance of delivery of said instrument, have subscribed our names the 24th day of February, 1891."

Messrs. Nash and Stoddard accepted delivery of this instrument on the same day that it was executed. Of the eleven

hospitals and twenty-one colleges named therein, only five of the former and six of the latter were mentioned in the will. The contest over the codicils continued and some feeling was aroused.    During the progress of the trial, Mr. Vaughan approached Miss Joyce, and, shaking his fist in her face, said ; " Miss Joyce, I will fight this thing as long as there is a dollar left of the Fayerweather money, and as long as I have a dollar of my own private fortune, and I want you to tell Mrs. Fayerweather this, and I mean every word I say." Miss Joyce testified that she told this to Mrs. Fayerweather, who had been an invalid for many years, and that as the result she was confined to her bed for several days.    She was weak, nervous and easily disturbed.

On the 5th of March, as the result of negotiations for a settlement of the contest pending before the surrogate, the widow and next of kin executed a paper, of which the following is a copy :

" In consideration of the instrument of even date herewith, executed by Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, residuary devisees and legatees under the will, meaning thereby the original will and the subsequent codicils of Daniel B. Fayerweather, late of the City of New York, deceased, and of its delivery to Henry Stoddard and Stephen P. Nash, we, the undersigned, being the widow and all of the next of kin of the said Daniel B. Fayerweather, do hereby severally agree for ourselves, our and each of our heirs, executors and administrators, as follows :

" 1. All objections to the probate of the will and four codicils of the late Daniel B. Fayerweather, offered for probate to the Surrogate of the County of New York, are hereby withdrawn, and we consent to the probate of the same.

" 2. No suit shall hereafter be brought for the construction of the said will and codicils, or either of them, or to set aside the will and codicils, or either of them, and we further agree not to make any claim upon the said Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, or either of them, or against their heirs or personal representatives, or either

against them, the said Bulkley, Ritch and Vaughan, as executors, or as residuary legatees, other than for the amounts left to us by the will and codicils aforesaid, and the deed of gift executed by the said Bulkley, Ritch and Vaughan on the 24th day of February, 1891, and the instrument dated on the 5th day of March, 1891.

" 3. Upon the payment to the undersigned, respectively, of the several amounts mentioned in said deed of gift and said instrument, we will severally execute a general release of all claims, except those arising under the will and codicils, both to the executors and to the donees mentioned in the deed of gift, dated on the 24th day of February, 1891, and to the said Bulkley, Ritch and Vaughan, individually."

The instrument of even date referred to in this paper was executed by Messrs. Bulkley, Ritch and Vaughan on the 5th of March, and on the same day accepted by Messrs. Nash and Stoddard, whereby, under the power reserved by the deed of gift, they gave to Mrs. Fayerweather $225,000, to be at her absolute disposal, and increased her annuity from $15,000 to $25,000. They also agreed to give her a deed of the lot in Woodlawn Cemetery intended for the remains of her husband. They gave to Mrs. Achter $42,500, and to Mrs. Drury the same amount, and directed that all these gifts should be subject to the last paragraph of the deed of gift. At the same time the following paper was prepared and, between March 22 and June 6, 1891, executed by the officers of the various institutions named in the eighth and ninth clauses of the will, with one exception :

" Whereas, a contest has been proceeding in the Court of the Surrogate of the county of New York against the probate of the last will and testament and four codicils thereto, propounded by the executors of Daniel B. Fayerweather, deceased, and certain other proceedings have been threatened concerning the construction and validity of the will ; and, whereas, the undersigned are legatees named in said will, and it is to their interest to have the pending controversy settled and the threatened controversy abandoned ; and, whereas, a settlement

of all the controversies has been agreed to, whereby the widow
and next of kin have agreed to accept the sum of $310,000,
and, in consideration thereof, have consented to the probate
of the will and codicils as propounded, and agreed to release
the estate of said Fayerweather from all claims, excepting
those to which the said widow and next of kin are respectively
entitled by the provisions of the will and codicils aforesaid :

"Now, in consideration of the foregoing, and to enable the
provisions of the said settlement to be carried out, it is agreed
by the undersigned that the sum of $310,000 be paid by the
executors of the last will and testament of Daniel B. Fayer-
weather, deceased, prior to and in preference to the payments
to the undersigned, respectively, of the amounts of the lega-
cies in the will contained, and we each, for ourselves, agree
that our respective legacies shall be postponed to the payment
of the amount above mentioned."

On the 24th of March, 1891, the codicils were admitted to
probate upon a written consent signed by the attorneys for all
the parties to the contest.   On the 12th of June Mrs.
Fayerweather executed a release, of which the following is a
copy :

"To all to whom these presents shall come, or may concern,
greeting :

"Know ye, that I, Lucy Fayerweather, widow of Daniel
B. Fayerweather, of the city of New York, for and in con-
sideration of the sum of $225,000, lawful money of the
United States, to me in hand paid by Justus L. Bulkley,
Thomas G. Ritch and Henry B. Vaughan, as executors and
trustees under the last will and testament of Daniel B. Fayer-
weather, deceased, and individually, and as the representatives
of the persons or corporations hereinafter named, forming a
class known as donees under the deed of gift executed by the
said Bulkley, Ritch and Vaughan on February 24th, 1891,
which sum is in compromise and full settlement of any and
all contests on my part of the will of said Daniel B. Fayer-
weather, deceased, or concerning his estate, have remised,
released and forever discharged, and by these presents do, for

myself and for my heirs, administrators and executors, remise, release and forever discharge the said Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, as executors and trustees aforesaid, as individuals and as representatives of the said donees, constituting a class, and also the said donees, to wit, the persons and corporations mentioned in a certain deed of gift duly delivered, made by Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan on the 24th day of February, 1891, which deed of gift was introduced in evidence in the probate proceedings of the last will and testament of Daniel B. Fayerweather, deceased, and marked Exhibit No. 7, contestants, and which said deed of gift is hereby made a part of this release, in order that the persons constituting said class of donees, and to whom this release runs, may be more fully known, and also the legal successors, assigns, heirs, executors and administrators of all the aforesaid persons and corporations, of and from and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, claims and demands whatsoever, in law or in equity, which against the said persons or corporations, or any of them, I ever had, or now have, or which I or my heirs, executors or administrators hereinafter shall, can or may have, for, upon, or by reason of any matter, cause or thing whatsoever, except my claim for the annuity given me by the will and codicils thereto of said Daniel B. Fayerweather, deceased, and also my claim for the increased annuity mentioned in the agreement dated March 5th, 1891, and made pursuant to the deed of gift above referred to."

Similar releases were, at the same time, executed by or in behalf of the next of kin. Payments were promptly made by the executors from the funds of the estate to the widow and next of kin, on the basis of the settlement. During the course of a year the executors also paid eighty per cent of the specific legacies made to hospitals and colleges in the eighth and ninth articles of the will, but they have made no payment to any college or hospital from the residuary estate, so that they still hold all that part of the property that

is involved in this action, amounting with accumulations to nearly $3,000,000. When his will was made Mr. Fayerweather was worth about $3,000,000; at the time of his death about $5,000,000, and the entire estate, including payments already made, is now supposed to amount to about $6,000,000. As the specific gifts made by the deed of gift are "all without interest," one-half of the increase, according to that instrument, as well as $200,000 besides, would go to the Women's Hospital to whom the testator had given by his will only $10,000. Mrs. Fayerweather, the widow, died July 16, 1892, of the disease by which for many years she had been afflicted, leaving a will whereby she gave the bulk of her estate to her sister, Miss Joyce. Before her death she brought an action against Messrs. Ritch, Bulkley and Vaughan to set aside the releases and to establish a trust in favor of herself and her nieces. The plaintiffs in this action were made defendants and they set up by way of counterclaim, in substance, the matters upon which they now base their demand for relief. That action was continued by her executors after her decease, but the complaint was finally dismissed by default. The present plaintiffs, however, promptly notified the executors of Mr. Fayerweather's will that they should insist that the residuary estate was charged with a trust in favor of the institutions named in the ninth article, and that unless there was a voluntary recognition of this claim an action would be brought to enforce it. As the executors refused to recognize the claim, this action was brought in behalf of five out of the twenty colleges named in the ninth article, against all those interested in the will, the deed of gift, or otherwise, nearly all of whom appeared, and the most of them answered. The theory of the complaint is that the apparently absolute gift in the fourth codicil to Messrs. Ritch, Bulkley and Vaughan, individually, was really made upon a secret trust for the benefit of the plaintiffs and their associates in the ninth article of the will. No question was raised by any party as to the competency of the testator to make the will and codicils, all of which are conceded to have been properly

admitted to probate, but various positions were taken in regard to the effect of those instruments under all the circumstances. After a trial at Special Term the court filed a decision stating concisely the grounds upon which the issues had been decided, without making findings in detail. The grounds stated were, in substance, that Messrs. Ritch and Vaughan, for themselves and Mr. Bulkley, promised the testator and induced him to believe that if he would make them the residuary legatees of his estate, they would convert it into cash and divide it equally among the twenty corporations mentioned in the ninth article after paying $100,000 to the Northwestern University; that Mr. Fayerweather made those gentlemen his residuary legatees in reliance upon that promise, and died in the belief induced by them that they would act accordingly, but that they had attempted to dispose of the residuary estate in violation of the promise. The judgment directed was that Messrs. Ritch, Bulkley and Vaughan received the residuary estate devised to them in trust for the ninth article colleges as well as for the Northwestern University to the extent of $100,000, and that distribution should be made accordingly. This was in substantial accord with the theory of the plaintiffs and the relief demanded in the complaint. Upon appeal the General Term held that the facts found by the Special Term were amply supported by the evidence; that Messrs. Ritch and Vaughan definitely promised the testator to dispose of the residuary estate bequeathed to them in accordance with the provisions of the tenth clause of the will, and that there was an understanding between Mr. Bulkley and the testator that the estate should be so disposed of; that the statutory disability against devising or bequeathing more than one-half of a net estate to any corporation named in chapter 360 of the Laws of 1860 operates only for the benefit of the relatives in that act named, and not for the benefit of the heirs or next of kin; that, as the testator left him surviving a widow as the only person who could invoke the protection of the statute, and she had, as an incident to the settlement of the contest of the will, released to the executors all claims to the estate, they took the resid-

uary estate as trustees for the benefit of the ninth article col-
leges, and that under the circumstances such trust was not
rendered invalid by the statute, but should be upheld and
carried into effect.

The executors of the widow and two of the next of kin,
Mrs. Beardsley not having answered, Mr. Ritch, individually
and as executor and trustee, Messrs. Bulkley and Vaughan, as
executors, and the most of the donees under the deed of gift,
appeal to this court.

*James C. Carter* for donees under the deed of gift, appel-
lants.   The plaintiffs have failed to make out a case of any
understanding with reference to the final disposition of the
estate between the testator and them or either of them, that
the estate or either third thereof was to be disposed of in the
manner and proportions claimed by them; and even if the
evidence would justify a finding of a trust for institutions
generally, or for the plaintiffs and other institutions in an
undetermined and indefinite proportion, it would not avail
the plaintiffs in this case. (*McCormick* v. *Grogan*, L.
R. [4 E. & Ir. App.] 82; *Briggs* v. *Penny*, 3 DeG.
& S. 539; 3 MacN. & G. 546; *Clancarty* v. *Clancarty*,
L. R. [31 Ir.] 552–558; *In re Diggles*, L. R. [39 Ch. Div.]
253, 257, 258; *Podmore* v. *Gunning*, 5 Sim. 485; 7 Sim.
644.)   If we should allow all the plaintiffs' assumptions of
fact to be in entire accordance with the truth, while it might
follow, in some aspects of such a case, that the three residu-
ary legatees were charged with an equitable obligation to
turn over the property to the widow and next of kin, the
claim of the plaintiffs is most clearly invalid.   (L. 1860, ch.
360.)   Plaintiffs are effectually estopped in equity by their
conduct towards the residuary legatees and the donees under
the deed of gift in relation to the settlement with the widow
and next of kin from contesting the title of the donees under
the deed of gift.   (*O'Hara* v. *Dudley*, 95 N. Y. 403.)   The
plaintiffs are also concluded by the adjudication of the surro-
gate in relation to the collateral inheritance tax to dispute the

title of the residuary legatees and their donees.   (L. 1887,
ch. 713, §§ 2, 13, 15; L. 1891, ch. 216, § 1; L. 1892, ch. 399,
§§ 3, 10, 11, 12, 13.)

*C. N. Bovee, Jr.*, and *Stewart L. Woodford* for Thomas G.
Ritch, executor, appellant.   There is no foundation for the
claim of the defendants Reynolds and ·Beardsley, as executors
of Mrs. Fayerweather, the widow, and Mary W. Achter and
Emma S. Fayerweather, the heirs at law and next of kin.
They are bound by the stipulations and releases given on the
settlement of the contest in the proceedings on the probate in
the Surrogate's Court.   The charges of fraud made by the
defendants against Messrs. Ritch, Bulkley and Vaughan com-
pletely failed.   (*In re N. Y., L. & W. R. R. Co.*, 98 N. Y.
447; *Bleakley* v. *Sullivan*, 140 N. Y. 181; *Sentenis* v. *Ladew*,
140 N. Y. 466; *Mayor, etc.*, v. *M. R. Co.*, 143 N. Y. 26.)
No trust has been established in favor of the plaintiffs and
the other corporations named in the ninth clause of the will.
(*Tee* v. *Ferris*, 2 K. & J. 357; *Moss* v. *Cooper*, 1 J. & H.
367; *O'Hara* v. *Dudley*, 95 N. Y. 403; *Hooker* v. *Axford*,
33 Mich. 453; *In re King*, L. R. [21 Ir.] 273; *Wallgrave* v.
*Tebbs*, 2 Kay & J. 313; *Lomax* v. *Ripley*, 3 Sm. & G. 48; *Col-
lins* v. *Hope*, 20 Ohio, 492; *Carter* v. *Green*, 3 K. & J. 591;
*Chester* v. *Urwick*, 23 Beav. 407; *Moss* v. *Cooper*, 4 L. T. [N.
S.] 790; *McCormick* v. *Grogan*, L. R. [4 E. & Ir. App.]
82; *Boyes* v. *Carriett*, L. R. [26 Ch. Div.] 531; *Rowbotham*
v. *Dunnett*, L. R. [8 Ch. Div.] 430; *Jones* v. *Bradley*, L. R.
[3 Ch. App.] 362; *Bedilian* v. *Seaton*, 3 Wall. Jr. 279.)   Chap-
ter 360 of the Laws of 1860 applies to corporations named in
the ninth clause of the will.   (*Chamberlain* v. *Chamberlain*, 43
N. Y. 440; *Hollis* v. *Drew Theological Seminary*, 95 N. Y.
166; *Chamberlain* v. *Taylor*, 105 N. Y. 185; *Kerr* v. *Dough-
erty*, 79 N. Y. 327.)   If a trust is found extrinsic of the will
and codicils in favor of the plaintiffs, such trust would be void
under chapter 360 of the Laws of 1860.   (*Bascom* v. *Albert-
son*, 34 N. Y. 584; *Chamberlain* v. *Chamberlain*, 43 N. Y.
440; *McKeown* v. *Officer*, 6 N. Y. Supp. 203; *Boson* v.

*Statham*, 1 Eden, 508; *In re Spencer*, 57 L. T. [N. S.] 519; *O'Hara* v. *Dudley*, 95 N. Y. 415; *People ex rel.* v. *Lorillard*, 135 N. Y. 289; *Smith* v. *People*, 47 N. Y. 330; *People ex rel.* v. *Potter*, 47 N. Y. 375; *People ex rel.* v. *Angle*, 109 N. Y. 564.) The stipulations and releases of the widow and next of kin operated to transfer their interest in the residuary estate to the donees named in the deed of gift. (*Hastings* v. *B. H. T. Co.*, 9 Pick. 80–82; *Goodtitle* v. *Bailey*, Cowp. 597; Shep. Touch. 82; *Huggerston* v. *Hanbury*, 5 B. & C. 101; *Bryan* v. *Bradley*, 16 Conn. 474; *Bullard* v. *Hinckley*, 5 Me. 272; *Pray* v. *Pierce*, 7 Mass. 381; *Russell* v. *Coffin*, 8 Pick. 151; *Lynch* v. *Livingston*, 8 Barb. 473; 6 N. Y. 422; *McKeown* v. *Officer*, 6 N. Y. Supp. 201; *Tilden* v. *Green*, 130 N. Y. 29; *Harris* v. *A. B. Society*, 2 Abb. Ct. App. Dec. 316; *Harris* v. *Slaght*, 46 Barb. 470.) The decree of the surrogate fixing the collateral inheritance tax was an adjudication which is conclusive on the plaintiffs. (L. 1885, ch. 483; L. 1887, ch. 713; *McKinney* v. *Davis*, 6 Mo. 501; *Wyatt* v. *Burr*, 25 Ark. 476; *Yoes* v. *Moore*, 29 Ark. 121; *State* v. *Probate Court*, 25 Minn. 25; *Moerchen* v. *Stoll*, 48 Wis. 309; *State* v. *Riegart*, 39 Am. Dec. 628.) The assent of the plaintiffs to the settlement with the widow and next of kin and to the deed of gift estops them from claiming any interest in the residuary estate. (*Galliher* v. *Cadwell*, 145 U. S. 368; *Lemoine* v. *Dunklin Co.*, 51 Fed. Rep. 487; *Naddo* v. *Bardon*, 51 Fed. Rep. 493; *Speidel* v. *Henrici*, 120 U. S. 377; *Weseman* v. *Wingrove*, 85 N. Y. 353; *McLean* v. *Clapp*, 141 U. S. 429; Herman on Estoppel, §§ 1049, 1050, 1054–1056.)

*John E. Parsons* for Messrs. Bulkley and Vaughan, executors, appellants. To fasten a trust upon an absolute devise there must be a promise by the devisee, either express or by acquiescence. (*Lomax* v. *Ripley*, Notes of Cases, 12; *Chester* v. *Urwick*, Notes of Cases, 15; *Tee* v. *Ferris*, Notes of Cases, 16; *Carter* v. *Green*, Notes of Cases, 18; *Moss* v. *Cooper*, Notes of Cases, 19; *Jones* v. *Badley*, Notes of Cases, 23; *McCormick* v. *Grogan*, Notes of Cases, 23; *Rowbotham* v.

39

*Dunnett*, Notes of Cases, 29 ; *Boyes* v. *Carriett*, Notes of Cases, 31 ; *In re King's Estate*, Notes of Cases, 33.) Knowledge by a devisee of wishes of the testator does not create a trust. (*Lomax* v. *Ripley*, Notes of Cases, 12 ; *Wallgrave* v. *Tebbs*, Notes of Cases, 14 ; *Creagh* v. *Murphy*, Notes of Cases, 28 ; *Collins* v. *Hope*, Notes of Cases, 64.) A testator's intention *dehors* the will does not create a trust. (*Addlington* v. *Cann*, Notes of Cases, 3 ; *Briggs* v. *Penny*, Notes of Cases, 10 ; *Johnson* v. *Ball*, Notes of Cases, 10 ; *Lomax* v. *Ripley*, Notes of Cases, 12 ; *Tee* v. *Ferris*, Notes of Cases, 16 ; *Juniper* v. *Bachelor*, Notes of Cases, 22 ; *In re King's Estate*, Notes of Cases, 33 ; *Mann* v. *Mann*, Notes of Cases, 39 ; *Jackson* v. *Housel*, Notes of Cases, 39 ; *Tole* v. *Hardy*, Notes of Cases, 40 ; *Booth* v. *Baptist Church*, Notes of Cases, 47 ; *Thomas* v. *Thomas*, Notes of Cases, 55.) The communication to the devisee of the testator's wishes does not create a trust. (*Byran* v. *Godfrey*, Notes of Cases, 6 ; *Lomax* v. *Ripley*, Notes of Cases, 12 ; *Creagh* v. *Murphy*, Notes of Cases, 28 ; *Bedilian* v. *Seaton*, Notes of Cases, 37 ; *Ragsdale* v. *Ragsdale*, Notes of Cases, 62 ; *Collins* v. *Hope*, Notes of Cases, 64.) To create a trust requires that a promise shall be asked or desired and that it shall be given. (*Barrow* v. *Greenough*, Notes of Cases, 5 ; *Lomax* v. *Ripley*, Notes of Cases, 12 ; *Wallgrave* v. *Tebbs*, Notes of Cases, 14 ; *Carter* v. *Green*, Notes of Cases, 18 ; *Moss* v. *Cooper*, Notes of Cases, 19 ; *Jones* v. *Badley*, Notes of Cases, 23 ; *McCormick* v. *Grogan*, Notes of Cases, 23 ; *Boyes* v. *Carriett*, Notes of Cases, 31 ; *In re King's Estate*, Notes of Cases, 33 ; *Bedilian* v. *Seaton*, Notes of Cases, 37.) Where the purpose is to evade statutes like the acts of 1848 and 1860, in the nature of mortmain statutes, a trust will not be enforced. (*Boson* v. *Statham*, Notes of Cases, 5 ; *Mucklestone* v. *Brown*, Notes of Cases, 6 ; *Stickland* v. *Aldridge*, Notes of Cases, 6 ; *Russell* v. *Jackson*, Notes of Cases, 11 ; *Tee* v. *Ferris*, Notes of Cases, 16 ; *Springett* v. *Jennings*, Notes of Cases, 26 ; *In re Spencer's Will*, Notes of Cases, 32 ; *In re O'Hara*, Notes of Cases, 43 ; *Gilman* v. *McArdle*, Notes of Cases, 45 ; *Alston* v.

*Coleman*, Notes of Cases, 52; *Trotter* v. *Blocker*, Notes of Cases, 51; *Cunningham* v. *Cunningham*, Notes of Cases, 64; *Gore* v. *Clarke*, Notes of Cases, 69.) A court of equity will decline to take part in a fraud upon the law. (*Boson* v. *Statham*, Notes of Cases, 5; *Mucklestone* v. *Brown*, Notes of Cases, 6; *Stickland* v. *Aldridge*, Notes of Cases, 6; *Russell* v. *Jackson*, Notes of Cases, 11; *Tee* v. *Ferris*, Notes of Cases, 16; *Springett* v. *Jennings*, Notes of Cases, 26; *In re Spencer's Will*, Notes of Cases, 32; *In re O'Hara*, Notes of Cases, 43; *Alston* v. *Coleman*, Notes of Cases, 52; *Pool* v. *Harrison*, Notes of Cases, 52.) It will decline to do so *proprio motu*. (*Richardson* v. *Buhl*, 77 Mich. 632.) A promise by one of several devisees does not fasten a trust upon the devise to the others. (*Tee* v. *Ferris*, Notes of Cases, 16; *Moss* v. *Cooper*, Notes of Cases, 19; *Rowbotham* v. *Dunnett*, Notes of Cases, 29.) No trust is created where a discretion is conferred upon the devisee. (*Curtis* v. *Ripon*, Notes of Cases, 7; *Sale* v. *Moore*, Notes of Cases, 8; *Bardswell* v. *Bardswell*, Notes of Cases, 9; *Knight* v. *Bouten*, Notes of Cases, 9; *Winch* v. *Brutton*, Notes of Cases, 9; *Briggs* v. *Penny*, Notes of Cases, 10; *Palmer* v. *Simmonds*, Notes of Cases, 13; *Reeves* v. *Baker*, Notes of Cases, 13; *Greene* v. *Greene*, Notes of Cases, 26; *Lambe* v. *Eames*, Notes of Cases, 27.) To create a trust clear and definite language must be used. (*Curtis* v. *Ripon*, Notes of Cases, 7.)

*Edward C. James* and *William Blaikie* for the widow's executors and for the next of kin of Mr. Fayerweather, appellants. This secret trust, definite or indefinite, was a scheme to evade a statute, and fraudulent as to those whom that statute protected. (*Phillips* v. *Phillips*, 112 N. Y. 197; *Willets* v. *Willets*, 103 N. Y. 650; 35 Hun, 401; *In re Ingersoll*, 131 N. Y. 573; *Colton* v. *Colton*, 127 U. S. 300; *Moss* v. *Cooper*, 1 J. & H. 352; *Russell* v. *Jackson*, 10 Hare, 204; *Riker* v. *Leo*, 133 N. Y. 519; *Lawrence* v. *Cook*, 104 N. Y. 632; *In re Keleman*, 126 N. Y. 73; *Rowbotham* v. *Dunnett*, L. R. [8 Ch. Div.] 430, 442; *O'Hara* v. *Dudley*,

95 N. Y. 417; *Prichard* v. *Thompson,* 95 N. Y. 76; *Tilden* v. *Green,* 130 N. Y. 29; *Read* v. *Williams,* 125 N. Y. 560; *Holland* v. *Alcock,* 108 N. Y. 312.) The trust was concealed so as to evade, if possible, chapter 360 of the Laws of 1860. (*Chamberlain* v. *Chamberlain,* 43 N. Y. 424.) Any person entitled to share in the estate in case of intestacy may have the protection and benefit of chapter 360 of the Laws of 1860. (*Harris* v. *A. B. Society,* 2 Abb. Ct. App. Dec. 316; *Rich* v. *Tiffany,* 2 App. Div. 25; *Church of the Redemption* v. *Grace Church,* 68 N. Y. 570–582; *Stephenson* v. *Short,* 92 N. Y. 433, 441; *Harris* v. *Slaght,* 46 Barb. 470; *McKeown* v. *Officer,* 25 N. Y. S. R. 319; 6 N. Y. Supp. 201.) The act of 1860 was a remedial act, intended to prevent the wrong frequently done to families by excessive giving away of property for benevolent or charitable purposes, to take effect at death, and should be so construed in all cases as to carry out its beneficent purposes. (*Way* v. *East,* 2 Drury, 53; *O'Hara* v. *Dudley,* 95 N. Y. 420; *Chamberlain* v. *Chamberlain,* 43 N. Y. 424; *McKeown* v. *Officer,* 25 N. Y. S. R. 322; *Harris* v. *Slaght,* 46 Barb. 470; Maxwell on Interp. of Stat. [2d ed.] 133; *People* v. *Utica Ins. Co.,* 15 Johns. 380, 381; *Tonnele* v. *Hall,* 4 N. Y. 144; *People ex rel.* v. *Potter,* 47 N. Y. 375; *People ex rel.* v. *Angle,* 109 N. Y. 568; *P. R. T. Co.* v. *Dash,* 125 N. Y. 93; *People ex rel.* v. *Canvassers,* 143 N. Y. 88.) Under the act of 1860 the half part of the estate, after the payment of debts, which the testator is allowed to give to educational and charitable institutions, is to be computed with reference to the value of his estate at the time of his death. (*Harris* v. *A. B. Society,* 2 Abb. Ct. App. Dec. 316; *Hollis* v. *D. T. Seminary,* 95 N. Y. 166, 178.) The balance which testator has attempted to give by will to institutions, "in trust, or otherwise," should be treated as property not disposed of by the will, and as such is vested, under the Statute of Distributions, one-half in his widow and one-sixth in each of his three nieces. (*McKeown* v. *Officer,* 25 N. Y. S. R. 319; *Harris* v. *Slaght,* 46 Barb. 470; 4 Abb. Pr. [N. S.] 421; *Read* v. *Williams,* 125 N. Y. 560; *O'Hara* v. *Dudley,* 95 N. Y. 403;

*Wager* v. *Wager,* 89 N. Y. 161; *Bowers* v. *Smith,* 10 Paige, 200.) The act of 1860 cannot be evaded by a secret trust. (27 Am. & Eng. Ency. of Law, 9; 1 Hill on Trustees [4th ed.], 164; *Stockton* v. *Railroad Co.,* 50 N. J. Eq. 52; *Railroad Co.* v. *Commonwealth,* 7 Atl. Rep. 371; *People* v. *N. R. S. R. Co.,* 121 N. Y. 582; *People* v. *C. G. Co.,* 130 Ill. 268; *State* v. *S. O. Co.,* 49 Ohio St. 137; Kerr on Fraud & Mistake, 43, 279; *O'Hara* v. *Dudley,* 95 N. Y. 420, 421; *Boson* v. *Statham,* 1 Cox Eq. Cas. 16; *Mucklestone* v. *Brown,* 6 Ves. 52; *Stickland* v. *Aldridge,* 9 Ves. 516; *Pilkington* v. *Broughey,* 12 Sim. 114; *Way* v. *East,* 2 Drury, 53.) The twenty colleges are literary or scientific corporations, and within the act of 1860. (L. 1870, ch. 51, § 3; *Chamberlain* v. *Chamberlain,* 43 N. Y. 424; 3 Lans. 48; *Hollis* v. *D. T. Sem.,* 95 N. Y. 166.) The deed of gift of February 24, 1891, was a fraud. (Perry on Trusts, § 172; *Huguenin* v. *Basely,* 14 Ves. 273; *Allcard* v. *Skinner,* L. R. [36 Ch. Div.] 160.) The transactions of the executors and trustees with the widow and nieces were fraudulent and should be set aside. (*Blake* v. *Monatt,* 21 Beav. 613; 73 N. Y. 597; 57 N. Y. 473; 1 Lewin on Trusts, 265; Kerr on Fraud & Mistake, 192; *Gandy* v. *McCauley,* L. R. [31 Ch. Div.] 16.) The agreement and releases were obtained from the widow and nieces as part of the scheme of fraud embodied in the deed of gift. (Kerr on Fraud & Mistake, 43; *Warner* v. *Blakeman,* 4 Abb. Ct. App. Dec. 530; *Fairchild* v. *McMahon,* 139 N. Y. 290; *Jones* v. *Jones,* 120 N. Y. 589, 598, 599; *Nat. L. Ins. Co.* v. *Minch,* 53 N. Y. 145; *Krumm* v. *Beach,* 96 N. Y. 398; *Mayer* v. *Dean,* 115 N. Y. 556; *C. C. & I. Co.* v. *Sherman,* 30 Barb. 553.) The releases were obtained by a breach of the fiduciary duty which the executors and trustees owed to the widow and next of kin. (*Wager* v. *Wager,* 89 N. Y. 166; *Read* v. *Williams,* 125 N. Y. 560, 566; *Bowers* v. *Smith,* 10 Paige, 200; *Tilden* v. *Green,* 130 N. Y. 52; *O'Hara* v. *Dudley,* 95 N. Y. 403, 411, 422; *Holland* v. *Alcock,* 108 N. Y. 312; *In re Ingersoll* 131 N. Y. 573; *Russell* v. *Jackson,* 10 Hare, 204; *Jones* v. *Badley,* L. R. [3 Eq. Cas.] 635; Perry on Trusts [4th ed.],

§ 166; *Thomson* v. *Eastwood*, L. R. [2 App. Cas.] 215; *C. C. & I. Co.* v. *Sherman*, 30 Barb. 553.) The agreement and releases cannot be maintained in equity as fair settlements of doubtful rights. (Kerr on Fraud & Mistake, 124; *Adair* v. *Brimmer*, 74 N. Y. 554; *Walker* v. *Symonds*, 3 Swanst. 72; 2 Beach on Mod. Eq. Juris. § 1005; Harriman on Cont. 247; Perry on Trusts [4th ed.], § 179; *Stewart* v. *W. R. Co.*, 128 U. S. 388; Hill on Trustees, 148; Godefroi on Trusts, 485; *Gandy* v. *Macauley*, L. R. [31 Ch. Div.] 1; *Thompson* v. *Eastwood*, L. R. [2 App. Cas.] 215; *Dickson* v. *Paterson*, 160 U. S. 592; *Leach* v. *Leach*, 65 Wis. 285; *Farnam* v. *Brooks*, 9 Pick. 220; *Huguenin* v. *Baseley*, 14 Ves. 273; *Landsdowne* v. *Landsdowne*, 2 J. & W. 205; *Stewart* v. *Ahrenfeldt*, 4 Den. 190; *In re Keleman*, 126 N. Y. 73.) The gifts of $310,000 were inadequate as a price for the sale and conveyance of the interests of the widow and nieces in the residuary estate, which were worth at least $2,200,000. (*Parmelee* v. *Cameron*, 41 N. Y. 392; Kerr on Fraud & Mistake, 186, 187; *Wright* v. *Wright*, 26 Atl. Rep. 166; *Dunn* v. *Chambers*, 4 Barb. 376; *Jones* v. *Jones*, 120 N. Y. 589, 599; *Barnard* v. *Gantz*, 140 N. Y. 249; *Tait* v. *Williamson*, L. R. [2 Ch. App.] 55; *Morse* v. *Royal*, 12 Ves. 355, 371; *Gandy* v. *Macauley*, L. R. [31 Ch. Div.] 16; *Crowe* v. *Ballard*, 1 Ves. 218; *Thompson* v. *Eastwood*, L. R. [2 App. Cas.] 215.) The agreements and leases were obtained by Ritch, Bulkley and Vaughan by oppressive conduct toward the sick widow, accompanied with threats, and by the abuse of their position and power as executors and trustees in control of the estate, and constitute duress. (Kerr on Fraud & Mistake, 45; *Sears* v. *Shafer*, 6 N. Y. 268; *Allore* v. *Jewell*, 94 U. S. 506; *Griffith* v. *Godey*, 113 U. S. 89; *Harding* v. *Wheaton*, 2 Mas. 387; *Hull* v. *Perkins*, 3 Wend. 626; *Green* v. *Roworth*, 113 N. Y. 462; *Weller* v. *Weller*, 44 Hun, 172; 112 N. Y. 655; *Toms* v. *Greenwood*, 30 N. Y. S. R. 478; *Barnard* v. *Gantz*, 140 N. Y. 249; *Farnam* v. *Brooks*, 9 Pick. 220.) The plaintiffs and defendants insist that they respectively should be allowed to keep and enjoy

the advantages, which the executors secured from the widow and nieces by their releases, because the widow was represented in the probate proceedings by competent and independent advisers and are, therefore, bound. This is untenable. (*Gibbs* v. *Daniel,* 4 Giff. 162; *Nesbit* v. *Lockman,* 34 N. Y. 167; *Weller* v. *Weller,* 44 Hun, 172; 112 N. Y. 655; *Grosvenor* v. *Sherratt,* 28 Beav. 659; *Tate* v. *Williamson,* L. R. [2 Ch. App.] 155.) These defendants are entitled to affirmative relief. (Code Civ. Pro. §§ 521, 1204; *Derham* v. *Lee,* 87 N. Y. 599; *Mahr* v. *N. U. F. Ins. Society,* 127 N. Y. 452; *Turner* v. *Conant,* 18 Abb. [N. C.] 160; *Price* v. *Holman,* 17 N. Y. S. R. 572; *Love* v. *Dierckes,* 16 Abb. [N. C.] 47, 58, 59; *Derrick* v. *Emmens,* 38 N. Y. S. R. 481; *Gould* v. *C. C. Nat. Bank,* 99 N. Y. 333; *Bosley* v. *N. M. Co.,* 123 N. Y. 551.) This case is to be decided in this court under the jurisdiction and practice which prevailed here before January 1, 1896. (Code Civ. Pro. § 190; *Getty* v. *Devlin,* 54 N. Y. 403; *N. T. Bank* v. *Wetmore,* 124 N. Y. 241; *Thurber* v. *Chambers,* 66 N. Y. 42; *Piper* v. *Hoard,* 107 N. Y. 73; *Post* v. *Mason,* 91 N. Y. 540; *In re Keleman,* 126 N. Y. 73.) It is no answer to the claim of the widow and nieces to have these agreements and releases set aside that Ritch, Bulkley and Vaughan obtained them for the benefit of colleges and hospitals. (*Fairchild* v. *McMahon,* 139 N. Y. 290; *Jones* v. *Jones,* 120 N. Y. 589, 598; *N. L. Ins. Co.* v. *Minch,* 53 N. Y. 145; *Krumm* v. *Beach,* 96 N. Y. 398; *Mayer* v. *Dean,* 115 N. Y. 556; *C. C. & I. Co.* v. *Sherman,* 30 Barb. 553; Perry on Trusts, § 172.) The doctrine of election is not applicable to this case. (*Hawley* v. *James,* 16 Wend. 61, 254; *Thompson* v. *Clendenning,* 1 Sandf. Ch. 387, 397; *Arnold* v. *Gilbert,* 3 Sandf. Ch. 531, 563; *Chipman* v. *Montgomery,* 63 N. Y. 221; 1 Pom. Eq. Juris. §§ 512, 515; 2 Story's Eq. Juris. § 1097; Kerr on Fraud & Mistake, 451, 453; *Terry* v. *Munger,* 121 N. Y. 161; *E. C. F. Co.* v. *Hersee,* 103 N. Y. 25; *Sawyer* v. *Wood,* 3 Johns. Ch. 416; *Jones* v. *Jones,* 120 N. Y. 589; *Akin* v. *Kellogg,* 39 Hun, 256; *Stuart* v. *Waterhouse,* 10 Yerg. 94; *Read* v. *Williams,* 125 N. Y. 560.)

*Brownell & Lathrop* for Barnard College and other donees under the deed of gift, appellants.   There is no evidence that the absolute legacy contained in the fourth codicil, executed on November 15, 1890, was upon an indefinite trust in favor of charitable or literary or educational institutions generally. (*In re Keleman,* 126 N. Y. 73; *Fairchild* v. *Edson,* 77 Hun, 298; *Matter of O'Hara,* 95 N. Y. 403; *Lawrence* v. *Cooke,* 104 N. Y. 632; *McCormick* v. *Grogan,* L. R. [4 Eng. & Ir. App.] 82; *Wallgrave* v. *Tebbs,* 2 K. & J. 313.)   If the court should find that there was a resulting trust in favor of the plaintiffs and the other legatees under the ninth clause of the will, then, so far as said residue, together with the legacies in the will and codicils to benevolent and literary institutions, exceeds one-half of the testator's estate at the time of his death, such trust would be void under the statute of 1860 (Chap. 360), and such excess passed as intestate estate to the widow and next of kin, and by their releases to the donees under the deed of gift. (*Chamberlain* v. *Chamberlain,* 43 N. Y. 440; *Hollis* v. *D. T. Sem.,* 95 N. Y. 177; *Boson* v. *Statham,* 1 Cox Eq. Cas. 16; *O'Hara* v. *Dudley,* 95 N. Y. 415.)   The plaintiffs are concluded by the adjudication of the surrogate in relation to the collateral inheritance tax to dispute the title of the residuary legatees and their donees.   (L. 1887, ch. 713; L. 1891, ch. 216; L. 1892, ch. 399.)

*Harry Van Ness Philip* and *Edward Winslow Paige* for Union College, appellant.   If the twenty colleges have got a trust, they will get their money without any release by Mrs. Fayerweather, but if the act relating to wills applies, they have not only not got any trust, but they have not got any interest at all, and no release by Mrs. Fayerweather, unless it were a conveyance to them, which is not, and could not be successfully, pretended, could give them any interest. (*McKeown* v. *Officer,* 25 N. Y. S. R. 319; *Harris* v. *Slaght,* 46 Barb. 470; *Harris* v. *A. B. Society,* 4 Abb. Pr. [N. S.] 421.)   The effect of the act relating to wills upon the facts found by the trial court was to create a trust *ex maleficio*

upon one-half of the whole estate, in favor of the widow and next of kin. This trust sprang into life immediately upon the death of the testator, and the residuary legatees took the property impressed with it. No other person had any interest of any sort in this one-half of the estate. (*O'Hara* v. *Dudley*, 95 N. Y. 403; *Lefevre* v. *Lefevre*, 59 N. Y. 434; *Bascom* v. *Albertson*, 34 N. Y. 584; *In re McGraw*, 111 N. Y. 66; *Downing* v. *Marshall*, 23 N. Y. 366; *Harris* v. *A. B. Society*, 4 Abb. Pr. [N. S.] 421; *McKeown* v. *Officer*, 25 N. Y. S. R. 319; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Stephenson* v. *Short*, 92 N. Y. 433; *Hollis* v. *D. T. Sem.*, 95 N. Y. 166.) The deeds of release are effectual to convey to the donees under the deed of gift the one-half of the estate. (Schouler on Per. Prop. [2d ed.] § 77; Story's Eq. Juris. § 1047; *French* v. *Carhart*, 1 N. Y. 96; *In re Ladue*, 118 N. Y. 213; *L. I. R. R. Co.* v. *Conklin*, 29 N. Y. 572; *Pray* v. *Pierce*, 7 Mass. 381; *Hastings* v. *B. H. T. Co.*, 9 Pick. 80; 2 Black. Comm. 324; *Miller* v. *Emans*, 19 N. Y. 384; *Ham* v. *Van Orden*, 84 N. Y. 269.)

*Charles M. Earle* for Manhattan Dispensary, one of the donees under the deed of gift, appellant. The statute bars any recovery, at least as to one-half of the estate. (L. 1860, ch. 360.)

*Elihu Root* for Hamilton College, *James L. Bishop* for Amherst College, *Horace Russell* for Dartmouth College, *William B. Putney* for Williams College, respondents. This action is brought to establish and enforce a constructive trust. Equity constructs and enforces such trusts by reason of acts or threatened acts of parties which are in violation of good faith. It fastens a conscientious obligation upon them by virtue of the relation which they have assumed towards others, and which they ought not to be permitted to violate. (*Wallgrave* v. *Tebbs*, 2 K. & J. 313; *McCormick* v. *Grogan*, L. R. [4 Eng. & Ir. App.] 82; *Kilpatrick* v. *Gledden*, 81 Me. 137; *Williams* v.

40

*Fitch*, 18 N. Y. 546; *Chester* v. *Unwick*, 23 Beav. 47; *Browne* v. *Browne*, 1 H. & J. 43; *Grant* v. *Bradstreet*, 87 Me. 583; *Dowd* v. *Tucker*, 41 Conn. 197; *Buckingham* v. *Clark*, 61 Conn. 204; *Garther* v. *Garther*, 3 Md. Ch. 158; *Brooke* v. *Chappell*, 34 Wis. 405; *Reech* v. *Kennegal*, 1 Ves. Sr. 123; *Barrow* v. *Greenough*, 3 Ves. 152; *Ragsdale* v. *Ragsdale*, 68 Miss. 92.) The devise of the residuary estate to Ritch, Bulkley and Vaughan was made upon the assurance of Ritch and Vaughan for themselves and Mr. Bulkley that it should be divided equally among the colleges named in the ninth paragraph of the will. The finding of the Special Term, affirmed by the General Term, is conclusive upon this proposition. (*Halpin* v. *P. Ins. Co.*, 118 N. Y. 165; *Crim* v. *Starkweather*, 136 N. Y. 635; *Burnap* v. *Nat. Bank of P.*, 96 N. Y. 125, 131; *Koehler* v. *Hughes*, 148 N. Y. 507, 515; *Hewlett* v. *S. C. S. Co.*, 84 Hun, 248.) There was abundant evidence to support the finding of the Special Term. (*Phillips* v. *Phillips*, 112 N. Y. 197, 202; *Colton* v. *Colton*, 127 U. S. 300.) The plaintiffs' equitable rights to the residuary estate are not affected by the act of 1860, which is confined to a devise or bequest in a last will and testament, and the plaintiffs' rights do not arise out of a devise or bequest in Mr. Fayerweather's will. (*Harris* v. *Horwell*, Gilb. Eq. 11; 2 Eq. Cas. Abr. 46; *Addington* v. *Cann*, 3 Atk. 141; *O'Hara* v. *Dudley*, 95 N. Y. 403; *Rookwood's Case*, Cro. Eliz. 164; *Chester* v. *Urwick*, 25 Beav. 407; *Williams* v. *Fitch*, 18 N. Y. 546; *Browne* v. *Browne*, 1 H. & J. 43; *In re Boyes*, L. R. [26 Ch. Div.] 531; *In re King*, L. R. [21 Ir.] 273; *Cullen* v. *Atty.-Gen.*, L. R. [1 Eng. & Ir. App.] 190; *Olliffe* v. *Wells*, 130 Mass. 221; *Hoge* v. *Hoge*, 1 Watts, 163; *Church* v. *Ruland*, 64 Penn. St. 442.) Neither the residuary legatees nor the voluntary donees, who take only under them, can invoke the application of the act of 1860. (2 R. S. 57, § 3; 1 R. S. 460, §§ 31–37; L. 1865, ch. 585, § 5; L. 1892, ch. 687, § 12; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Downing* v. *Marshall*, 23 N. Y. 386; *In re McGraw*, 111 N. Y. 66; *Hollis* v. *D. T.*

*Sem.*, 95 N. Y. 166; *Chamberlain* v. *Chamberlain*, 3 Lans. 348; *Stephenson* v. *Short*, 92 N. Y. 441; Endlich on Interp. of Stat. 360; *Smith* v. *Saxton*, 50 N. H. 586; *Burthaupt* v. *Bauskeet*, 1 Rich Eq. 465; *Ford* v. *McElroy*, 1 Rich Eq. 474; *Bouknight* v. *Brown*, 16 S. C. 155; *Anderson* v. *Roberts*, 18 Johns. 513; *Porter* v. *Wormser*, 94 N. Y. 431; *Wells* v. *Monihan*, 129 N. Y. 161; *Smith* v. *Slosson*, 89 Hun, 568; *Ryan* v. *Dox*, 34 N. Y. 307.) The rights of the widow and next of kin have been extinguished, and no obstacle remains in any event to the enforcement of the trust. (*McCartee* v. *O. A. Soc.*, 9 Cow. 437; *Post* v. *Mason*, 91 N. Y. 539; *Hoyt* v. *Hoyt*, 112 N. Y. 505; *Bork* v. *Martin*, 132 N. Y. 280; *Leiper* v. *Hoffman*, 20 Miss. 615; *Cowan* v. *Stamps*, 46 Miss. 445; *In re Windle*, 2 Edw. Ch. 585; *Prosser* v. *Edmunds*, 1 Y. & C. 481; Perry on Trusts, § 69; Pom. Eq. Juris. § 1276; Pom. Rem. & Rem. Rights, 153; *Traer* v. *Clews*, 115 U. S. 539; *Graham* v. *R. R. Co.*, 102 U. S. 148; *Gruber* v. *Baker*, 20 Nev. 453; *Norton* v. *Tuttle*, 60 Ill. 130; *Hill* v. *Boyle*, L. R. [4 Eq.] 260; *DeHoughton* v. *Money*, L. R. [2 Ch.] 169; *Williams* v. *Boyle*, 1 Misc. Rep. 364.) The adjudication by the surrogate relative to the collateral inheritance tax was not a determination of any question or questions involved in this action, and does not conclude the plaintiffs' claim herein, or in any wise affect the same. (L. 1887, ch. 713, § 1; *In re Keleman*, 126 N. Y. 73; *In re Walker*, 136 N. Y. 20; *Krekeler* v. *Ritter*, 62 N. Y. 372; *In re Ullmann*, 137 N. Y. 403; *In re Wolfe*, 137 N. Y. 205; *Wright* v. *Delafield*, 25 N. Y. 271.)

*Martin W. Cooke* for Rochester University, respondent. Not any of the plaintiffs, nor any of the colleges named in the ninth clause of the will, come within the description of societies, associations or corporations contained in the act of 1860 concerning wills. (Georgia Code, § 2419; R. S. of Ohio, § 5915.) Assuming that Mr. Fayerweather had a wife living, and that the plaintiffs and the colleges named in the ninth clause of the will are such corporations as are described in the

said act of 1860, the trusts herein asserted do not depend upon, and were not created by, the last will and testament of Mr. Fayerweather, and the beneficial interests were not " devised " or " bequeathed " to the colleges in question by his last will and testament. The method employed did not come within the inhibition of the statute any more than a deed of gift would or any other lawful method of transfer. (*People* v. *Cothran*, 27 Hun, 344; L. 1848, ch. 319; L. 1857, ch. 302; L. 1895, ch. 559; *Harris* v. *Slaght*, 46 Barb. 470; *Hollis* v. *D. T. Sem.*, 95 N. Y. 166; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424; *Lefevre* v. *Lefevre*, 59 N. Y. 434; *Kerr* v. *Dougherty*, 79 N. Y. 327; *Stephenson* v. *Short*, 92 N. Y. 433; *In re O'Hara*, 95 N. Y. 420.) The defendants Ritch, Bulkley and Vaughan became trustees *ex maleficio* for the colleges named by the testator the moment he executed the codicil, certainly not later than the moment he died. (Pollock on Cont. 302.)

*Alfred W. Kiddle* for Northwestern University, respondent. The decisions of the Special and General Terms are fully sustained by the evidence. (*O'Hara* v. *Dudley*, 95 N. Y. 403.) The Northwestern University is a nominee or nominated *cestui que trust* of Mr. Fayerweather himself. The private memorandum of March 22, 1889, coupled with the antecedent conversations and all the circumstances which led up to and surrounded its execution and delivery to Mr. Ritch, created a trust which equity will enforce in favor of the Northwestern University. (*O'Hara* v. *Dudley*, 95 N. Y. 404; 1 Williams on Ex. 143; *Knox* v. *Knox*, 59 Wis. 172; *Colton* v. *Colton*, 127 U. S. 300; *Phillips* v. *Phillips*, 112 N. Y. 204; *Riordan* v. *Banon*, 10 Ir. Eq. 469.) Equity will impress a trust upon a fund whenever it would prove a fraud to divert such fund from the purpose for which its creator intended it should be applied. (*O'Hara* v. *Dudley*, 95 N. Y. 413; *Wheeler* v. *Reynolds*, 66 N. Y. 236; *Piper* v. *Hoard*, 107 N. Y. 73; *Rowbotham* v. *Dunnett*, L. R. [8 Ch. Div.] 430; *Hooker* v. *Axford*, 33 Mich. 453; *Russell* v. *Jackson*,

10 Hare, 206; *Wadd* v. *Hazleton,* 62 Hun, 607.) The act of the residuary legatees in nominating the Northwestern University as a donee or beneficiary under the deed of gift estops them from denying that thereby they have undertaken to carry out the wishes of Mr. Fayerweather as expressed in the private memorandum of March 22, 1889. (*Norton* v. *Mallory,* 63 N. Y. 437; *Robbins* v. *Robbins,* 89 N. Y. 257; *Hamer* v. *Sidway,* 124 N. Y. 538; *Day* v. *Roth,* 18 N. Y. 453; *Wadd* v. *Hazleton,* 62 Hun, 607; *Siemon* v. *Schurck,* 29 N. Y. 598, 612; *Fairchild* v. *Fairchild,* 64 N. Y. 476; *Chapman* v. *Porter,* 69 N. Y. 276; *Matter of Carpenter,* 131 N. Y. 86; *Foote* v. *Bryant,* 47 N. Y. 544.) The allegations in the complaint of the plaintiffs and in the answer of the next of kin and the executors of the estate of Lucy Fayerweather, admitting that the Northwestern University is entitled to the sum of $100,000, are conclusive upon the court in the absence of any provision of law which might prevent the university from taking the gift. (*Fairchild* v. *Fairchild,* 64 N. Y. 476; *Holmes* v. *Jones,* 121 N. Y. 466; *Tisdale* v. *D. & H. C. Co.,* 116 N. Y. 416; *Paige* v. *Willet,* 38 N. Y. 31; *Cook* v. *Barr,* 44 N. Y. 156.) None of the appellants have any standing in this court on appeal from the judgment entered herein as far as it relates to the Northwestern University. (*Marvin* v. *U. L. Ins. Co.,* 85 N. Y. 278; *Deland* v. *Richardson,* 4 Den. 95; *Scott* v. *Pilkington,* 15 Abb. Pr. 280; *Gillespie* v. *Torrance,* 4 Bosw. 36; 25 N. Y. 306.)

*William B. Hornblower, Howard A. Taylor* and *McCready Sykes* for Lincoln University, respondent. The memorandum of March 22, 1889, does not take away the rights of Lincoln University or Hampton Institute. (*Johnston* v. *Rowlands,* 2 De G. & S. 356; *Addington* v. *Cann,* 3 Atkyns, 141; *Johnson* v. *Ball,* 5 De G. & S. 85; *Lomax* v. *Ripley,* 3 Smale & G. 48; *Juniper* v. *Batchellor,* 19 L. T. 200; *In re King's Estate,* L. R. [21 Ir.] 273; *Thomas* v. *Thomas,* 7 West. Rep. 66; *Mann* v. *Mann,* 14 Johns. 1; *Tole* v. *Hardy,*

6 Cow. 333; *Booth* v. *B. Church*, 126 N. Y. 215.) The argument of the counsel for Union College, to the effect that the release operated as an assignment or conveyance to the donees under the deed of gift, and that no one but they can take advantage of it, is erroneous. (*Dambmann* v. *Schulting*, 75 N. Y. 55; *Graham* v. *Meyer*, 99 N. Y. 611; *Penny* v. *Martin*, 4 Johns. Ch. 566; *Kirchner* v. *N. H. S. M. Co.*, 135 N. Y. 182; *Harbeck* v. *Pupin*, 145 N. Y. 70; *Colton* v. *Field*, 131 Ill. 398; *Crum* v. *Sawyer*, 132 Ill. 443.)

VANN J. The appellants are of two classes, each hostile to the other and both hostile to the plaintiffs, who, with certain of the defendants, are respondents. One class comprises the executors of the widow and the next of kin, with the exception of Mrs. Beardsley, who unite in claiming that there was a secret trust in favor of the colleges named in the ninth article of the will, or of beneficiaries to be appointed by Messrs. Ritch, Bulkley and Vaughan, created by the gift of the residuary estate to those gentlemen in connection with their promise to the testator to turn over their legacy to such colleges or beneficiaries; that this trust was void as an evasion of the statute of 1860, or for indefiniteness, or both, except to the extent of the difference between the sum of $2,195,000, specifically given to colleges and hospitals, and one-half of the estate after payment of debts; that the deed of gift was void as a fraud upon the testator, the twenty colleges, the act of 1860 and the widow and next of kin; that the releases executed by the widow and next of kin were void, because they were procured by fraud, and that hence the executors of the widow and the next of kin are entitled to that part of the residuary estate, which, owing to the partial failure of the secret trust, was not disposed of by the will or codicils, but passed under the Statutes of Descents and Distributions as assets neither devised nor bequeathed.

The other class of appellants includes the residuary legatees and their donees under the deed of gift, who claim that the legacy in the tenth article was absolute, although made with

an expectation on the part of the testator that the residuary legatees would apply it in accordance with what they believed to be his wishes; and that, hence, the deed of gift was effective and the donees thereunder entitled to receive accordingly. Said donees further claim, for themselves, that if the residuary legatees were guilty of fraud, express or implied, in procuring the will and were thereby precluded from taking an absolute title, they held the gift for the benefit of the widow and next of kin, to whom it equitably belonged, and that the law would not fasten upon the fund an equitable obligation or trust to devote it to a purpose in violation of the law itself as expressed in the act of 1860; that the releases executed by the widow and next of kin to the residuary legatees operated as transfers, and not only made the original title of the latter complete, but confirmed the title conferred by them upon the donees under the deed of gift. They also insist that the plaintiffs are estopped, by encouraging and uniting in a settlement made with the widow and next of kin, from asserting a claim that would render that settlement of no value to those who parted with value in order to make it, and that an adjudication of the surrogate, made in a special proceeding under the Collateral Inheritance Act, is a bar to this action.

The respondents, being the plaintiffs and certain defendants who stand with them, are, with some exceptions, the colleges named in the ninth article of the will. Their claim is that the testator intended that the residuum of his estate should go to those colleges; that he would not have made the gift to the residuary legatees had he not been assured by them, or in their behalf, that they would thus dispose of their legacy; that, hence, the residuary legatees were under an equitable obligation to so dispose of it; that they had no right to disappoint his belief, based on their promises, which induced him to thus make his will, by disposing of the property through the deed of gift, which is, therefore, of no effect; that there was no violation of the statute of 1860 in fact, but, if there was, no one can take advantage of it but the widow and next of kin, who, by their releases, waived all the rights derived from that

statute, and, hence, that the settlement made with them inures to the benefit of the colleges named in the ninth article of the will, which thus became entitled to the residuary estate.

1. The first question presented for decision is, what facts may we assume to have been found by the courts below, whether expressed in words or not? The Code of Civil Procedure provides that " the decision of the court or the report of a referee upon the trial of the whole issues of fact may state separately the facts found and the conclusions of law and direct the judgment to be entered thereon; or the court or referee may file a decision stating concisely the grounds upon which the issues have been decided and direct the judgment to be entered thereon." (Code Civ. Pro. § 1022.) Although the decision by the Special Term and the affirmance by the General Term were general in form, necessarily some facts were found by those courts, even if they are not specified in the record. Otherwise, the burden of deciding questions of fact would be cast upon this court, which has jurisdiction to decide only questions of law. We think that the effect of a decision by the trial court without expressing the facts found is the same as if there had been a general verdict rendered by a jury, and that the same presumptions arise in its support. When a judgment entered upon a verdict has been affirmed by the General Term, this court can look into the evidence only to ascertain whether there were any facts proved upon which the jury could base their verdict. (*Hazman* v. *Hoboken Land & Imp. Co.*, 50 N. Y. 53–55.) If, upon such examination, the court finds that there is some evidence to sustain the verdict, and that upon any view of the facts the verdict can be upheld, it will not interfere with the determination of the General Term affirming the judgment, even when it might, if it had the power to determine the questions of fact embraced in the verdict, have reached a conclusion other than that reached by the jury. (*Maher* v. *Cent. Park R. R. Co.*, 67 N. Y. 52–55.) Where the affirmance is by an Appellate Division and is unanimous, we have no power to examine the record even to

see if there is any evidence to sustain the verdict. (*Szuchy* v. *Hillside Coal & Iron Co.*, 150 N. Y. 219–222.)   We are of the opinion, therefore, that where the decision of the Special Term does not state the facts found, and the judgment entered thereon has been affirmed by the General Term, upon an appeal to this court, all the facts warranted by the evidence and necessary to support the judgments below, are presumed to have been found.   Hence, upon such an appeal, we have no more control over the facts than we have when specific findings are made by the Special Term and affirmed by the General Term.   This conclusion takes the question as to the fraud alleged to have been practiced by the residuary legatees upon the widow and next of kin in procuring the releases out of the case, for it cannot be said on the record before us that the evidence tending to show fraud is so irresistible as to make the omission to find fraud an error of law.   Assuming that there was evidence enough to warrant the inference of fraud, there was also ample evidence to warrant the inference that there was no fraud.   A question of fact was thus presented which is beyond our power of review.   The only ground upon which it is claimed that the alleged fraud was so conclusively proved as not to involve a question of fact, is that the residuary legatees did not state that there was a secret trust in favor of the colleges named in the ninth article of the will, and that the effect of that trust was to vest the bulk of the residuary estate in the widow and next of kin.   What are the facts?   The residuary legatees were engaged in settling a lawsuit with hostile parties, toward whom they sustained no fiduciary relation, and who were represented by counsel of the highest standing and ability.   Substantially all of the material facts had been disclosed by the evidence taken during the trial, in which both parties to the releases were then engaged.   The residuary legatees had been examined at length upon the witness stand by counsel for the widow and next of kin, who had ample opportunity to make full discovery.   While they took the

position, to which they still adhere, that the gift to them was absolute, that position was not acquiesced in by the widow and nieces, for their counsel openly claimed and argued in Surrogate's Court that there was a secret trust, which was invalid, and that their clients were entitled to the residuary estate. While there may have been concealment of opinions, there was no concealment of the facts upon which those opinions were based. The residuary legatees were not bound to volunteer their opinions, even if they then thought there was a secret trust. One who is trying to settle litigation has the right to keep his opinion on the merits to himself. The controversy as to whether there was a secret trust or not, as well as the contest over the probate of the will, was fairly covered by the terms of the releases so far as the parties to those instruments were concerned. They dealt with each other, at arm's length, as adversary parties, knowing the substantial facts, and they are presumed to have had them in mind when the releases were executed, and to have covered by the language used all questions to which those facts could give rise. Even if we hold, when we reach the question, that there was a secret trust, that will not convict the residuary legatees of fraud in claiming the contrary before the surrogate, for one who neither withholds nor misstates the facts cannot be adjudged guilty of fraud simply because the courts finally decide the law to be other than he claimed it to be while engaged in litigation over the subject. Such a rule would make nearly every unsuccessful litigant guilty of fraud. From this statement it is obvious that there was no such concealment as would require the court, if the trial were before a jury, to direct a verdict on the basis of fraud proved beyond question. Our conclusion is that the executors of the widow and the nieces have no standing upon this appeal; so that the contest is narrowed to the other conflicting claimants, one class resting their claims upon the deed of gift and the releases, and the other upon the will, the secret trust and the releases.

2. The next question in the natural order of discussion is whether there was a secret trust.

While a testator may make a gift to a legatee solely for the purpose of enabling him, if he sees fit, to dispose of it in a particular way, still, if there is no promise by him, either express or implied, to so dispose of it, and the matter is left wholly to his will and discretion, no secret trust is created, and he may, if he chooses, apply the legacy to his own use. When it clearly appears that no trust was intended, even if it is equally clear that the testator expected that the gift would be applied in accordance with his known wishes, the legatee, if he has made no promise, and none has been made in his behalf, takes an absolute title and can do what he pleases with the gift. Whatever moral obligation there may be, no legal obligation rests upon him. On the other hand, if the testator is induced either to make a will or not to change one after it is made, by a promise, express or implied, on the part of a legatee that he will devote his legacy to a certain lawful purpose, a secret trust is created, and equity will compel him to apply property thus obtained in accordance with his promise. (*O'Hara* v. *Dudley*, 95 N. Y. 403; *Brown* v. *Lynch*, 1 Paige, 147; *Dowd* v. *Tucker*, 41 Conn. 197; *De Laurencel* v. *De Boom*, 48 Cal. 581; *Browne* v. *Browne*, 1 H. & J. 430; *Church* v. *Ruland*, 64 Penn. St. 442; *Towles* v. *Burton*, 24 Am. Dec. 409; *McLellan* v. *McLean*, 2 Head. 684; *Russell* v. *Jackson*, 10 Hare, 204; *Thynn* v. *Thynn*, 1 Vern. 296; *Reech* v. *Kennegal*, 1 Ves. Sr. 124; *Wallgrave* v. *Tebbs*, 2 K. & J. 321; *McCormick* v. *Grogan*, L. R. [4 Eng. & Ir. App.] 82.) The trust springs from the intention of the testator and the promise of the legatee. The same rule applies to heirs and next of kin who induce their ancestor or relative not to make a will by promising, in case his property falls to them through intestacy, to dispose of it, or a part of it, in the manner indicated by him. (*Williams* v. *Fitch*, 18 N. Y. 546; *Grant* v. *Bradstreet*, 87 Me. 583; *Gilpatrick* v. *Glidden*, 81 Me. 137.) The rule is founded on the principle that the legacy would not have been given, or intestacy allowed to ensue, unless the promise had been made, and, hence, the person promising is bound in equity to keep it, as to violate it would be

fraud.  While a promise is essential it need not be expressly made, for active co-operation or silent acquiescence may have the same effect as an express promise.  If a legatee knows what the testator expects of him, and having an opportunity to speak, says nothing, it may be equivalent to a promise, provided the testator acts upon it.  Whenever it appears that the testator was prevented from action by the action or silence of a legatee, who knew the facts in time to act or speak, he will not be permitted to apply the legacy to his own use when that would defeat the expectations of the testator.  As was said by this court in the *O'Hara* case (*supra*): " It matters little that McCue did not make in words a formal and express promise.  Everything that he said and everything that he did was full of that interpretation.  When the testatrix was told that the legal effect of the will was such that the legatees could divert the fund to their own use, which was a statement of their power, she was told also that she would only have their honor and conscience on which to rely, and answered that she could trust them, which was an assertion of their duty.  Where in such cases the legatee even by silent acquiescence encourages the testatrix to make a bequest to him, to be by him applied for the benefit of others, it has all the force and effect of an express promise."  The trust does not act directly upon the will by modifying the gift, for the law requires wills to be wholly in writing, but it acts upon the gift itself as it reaches the possession of the legatee, or as soon as he is entitled to receive it.  The theory is that the will has full effect by passing an absolute legacy to the legatee, and that then equity, in order to defeat fraud, raises a trust in favor of those intended to be benefited by the testator, and compels the legatee, as a trustee *ex maleficio*, to turn over the gift to them.  The law, not the will, fastens the trust upon the fund by requiring the legatee to act in accordance with the instructions of the testator and his own promise.  Neither the Statute of Frauds nor the Statute of Wills applies, because the will takes effect as written and proved, but to promote justice and prevent wrong the courts compel the legatee to

dispose of his gift in accordance with equity and good conscience.   As was well said in *Wallgrave* v. *Tebbs* (*supra*):

"Where a person knowing that a testator, in making a disposition in his favor, intends it to be applied for purposes other than his own benefit, either expressly promises or by silence implies that he will carry the testator's intention into effect, and the property is left to him upon the faith of that promise or undertaking, it is in effect a case of trust; and in such a case the court will not allow the devisee to set up the Statute of Frauds — or rather the Statute of Wills, by which the Statute of Frauds is now in this respect superseded, and for the reason that the devisee by his conduct has induced the testator to leave him the property; and, as Lord Justice TURNER says in *Russell* v. *Jackson*, no one can doubt that if the devisee had stated that he would not carry into effect the intentions of the testator, the disposition in his favor would not have been found in the will.   But in this the court does not violate the spirit of the statute, but for the same end, namely, prevention of fraud, engrafts the trust on the devise by admitting evidence, which the statute would in terms exclude, in order to prevent a party from applying property to a purpose foreign to that for which he undertook to hold it."

When these rules are applied to the case before us it can hardly be open to question that there was a secret trust attached to the gift of the residuary legatees.   The testator, by the tenth article of his will, created an express trust for the benefit of the colleges named in the ninth.   He knew, however, that that trust could not be carried into effect if his widow and nieces tried to prevent it.   He, therefore, appealed to their forbearance by means of the first memorandum, in which he speaks of making his will after advice from counsel as to the restrictions imposed by the law of this state in regard to benevolent corporations.   He evidently referred to the statute of 1860, and acting upon the belief that it would render the tenth article inoperative, except through their mercy, he begged them " to permit the provisions of " his " will to

be carried into effect." In a few months he became convinced that the mercy of his heirs was a frail reliance, so by his first codicil he revoked the tenth article and substituted in its place an absolute gift to Messrs. Bulkley and Ritch. Having with-drawn his appeal to the forbearance of his heirs, he next appealed to the honor of his residuary legatees by preparing a second memorandum, in which he said that he had made them such, "in the confidence that thereby" his intentions as expressed in his will would be carried into effect without liti-gation on the part of any one. The circumstances show that by his intentions as expressed in his will he meant his inten-tions as expressed in the tenth article thereof, and that the word "thereby" refers to the gift, absolute in form, made by the first codicil. This is made clear by the last sentence of the memorandum, in which he asks the residuary legatees to "take such steps by will or otherwise as will protect" his "estate against the contingency of the death of either before" his "estate is settled and distributed." If the gift was absolute, as it purported to be, what protection did his estate need in case either of the residuary legatees should die? Did he not mean that while he was willing to trust them, he was not willing to trust their heirs, and, hence, wanted the pro-tection of a will? By the third memorandum, made sev-eral years later, he assumed that there was an obligation on the part of the residuary legatees to dispose of their gift in accordance with his wishes. This appears on the face of the paper itself, though he was careful not to give direc-tions, but only to make suggestions. They related, however, to his property and in part to the method of distributing that portion which he had apparently given to them absolutely. He showed no change of intention when he made the Butler codicil, restoring the express trust as created by the tenth article, nor when he made his fourth codicil a few days later, renewing the absolute gift and adding Mr. Vaughan as one of the residuary legatees. The final gift, whether absolute in form or expressly in trust, was always to the same end. The changes made emphasize the intention and point to a single

object. No satisfactory reason has been given for making those changes, except that at different times he preferred different methods to accomplish the same thing. By every line he ever wrote and by every word he ever spoke, so far as the courts below permit us to hear them, he showed the same persistent, steadfast and unchangeable purpose to benefit the twenty colleges named in the ninth article of the will, except as he may have modified his original purpose by an extension of the trust so as to include the Northwestern University as indicated in the last memorandum. The will, codicils and memoranda, the letter to Mr. Ritch asking how his residuary estate would go in case of his death, and all the facts, as they are presumed to have been found by the courts below, establish the same fixed and constant purpose. Those facts appear so fully in their chronological order, in the statement annexed to this opinion, that further allusion to them will not now be made.

The intention of the testator being thus clear, the secret trust was completed by the promise made by or on behalf of the residuary legatees. As the gift was to them as tenants in common, a promise that bound all was necessary in order to include each of the three shares. That Mr. Ritch and Mr. Vaughan duly promised appears so conclusively from their conduct, letters and statements to the testator, that we do not regard any further expression of our views upon the subject as necessary. It is, however, strenuously urged that Mr. Bulkley made no promise, and hence that the secret trust did not extend to his share of the gift. If he were the only residuary legatee the question would be more serious, but he was not. The trial court found that Messrs. Ritch and Vaughan promised for themselves and for Mr. Bulkley, and the evidence plainly warrants this conclusion. The General Term, in its opinion, went farther and declared that there was an understanding between Mr. Bulkley and the testator to the same effect, but the evidence to sustain this conclusion is meagre, although we do not hold it was insufficient. Assuming, however, that Mr. Bulkley made no promise, still we think

that he was bound, under the circumstances, by the promise made in his behalf, and that he cannot profit by the action of his cotenants in making the promise for him, as that would be a fraud. He was not a purchaser; he furnished no consideration; there was no contract for his benefit; he was in the attitude of accepting a gift pure and simple, but that gift was made in reliance upon a promise given in his behalf. Can he violate the promise and fairly take that which came to him solely on account of the promise, even if it was not made or authorized by him? We think not, because his title came through the promise, and by accepting the gift he ratified the promise. He must repudiate the gift or accept the responsibility. While the cases are not uniform, the weight of authority sustains this conclusion. (*Hooker* v. *Axford*, 33 Mich. 453 ; *Moss* v. *Cooper*, 1 J. & H. 367; *Tee* v. *Ferris*, 2 J. & K. 357; *In re King's Estate*, L. R. [21 Ir.] 273; *O'Hara* v. *Dudley, supra.*) In the case last cited this court said: " So far, then, as McCue is concerned, he stands in the attitude of having procured and induced the testatrix to make a devise or bequest to himself and his associates by asserting its necessity, and promising faithfully to carry out the charitable purposes for which it was made, and whether his associates knew or promised, or did not, makes no difference where the devise is to them as joint tenants, and all must get their rights through the result accomplished by one." Although the devise in that case was to joint tenants, the principle that " all must get their rights through the result accomplished by one " is broad and equitable, and should not be limited to the technicality of a joint tenancy as distinguished from a tenancy in common, where, as in this case, the promise was made by two in behalf of themselves and another, and a devise thus obtained to the three. This rule prevents fraud, which is the primary object of the courts in enforcing secret trusts, while any other would promote fraud. We thus reach the conclusion that there was a secret trust that bound all of the residuary legatees.

3. What was the trust? While at first, by the will, it was

expressly for the benefit of the ninth article colleges, after the first codicil, although not so expressed, it was for the benefit of the same. . So far as any writing signed by the testator shows, it always continued so, except as it may have been modified by the private memorandum of March 22, 1889, in relation to the Northwestern University and others. That does not purport to do away with prior instructions, but is in the nature of suggestions to guide under the discretionary clause to withhold or reduce, in the ninth article of the will. It is advisory, but not obligatory. There are no words of direction, but all are of opinion, judgment and desire, as if the writer was making a recommendation for consideration, but not necessarily for action. Thus he says: "It is my judgment," "I think," "I would recommend," "I suggest," and "I also wish." If he intended to give directions why did he not embody them in one of the two codicils that he made after the date of the memorandum in question? But whether the words are regarded as absolute or discretionary, they do not invalidate the original promise, nor do they render the trust indefinite. The promise of the legatees kept pace with the testator's instructions and is to be considered in the light of all that transpired, not only on the last occasion, but on all previous occasions. When Mr. Fayerweather handed the memorandum to Mr. Ritch, who knew its contents, his silence under the circumstances was a promise to conform to whatever directions it may have contained, because if he did not intend to comply, it was his duty to say so. If it operates as an extension of the trust, as held by the courts below, and of which no complaint is made by any party to this appeal, still the modification is clear and definite and in no way affects the validity of the trust. It acts as a modification simply. We, therefore, have a trust for the benefit of the ninth article colleges, as modified, perhaps, by the last memorandum, with definite beneficiaries each capable of asserting itself as such.

It is, however, insisted that the testator in certain conversations with Mr. Ritch and Mr. Vaughan so modified his instructions, which their implied promise would follow, as to

include other institutions of learning that were to be selected by the residuary legatees. If such a modification was made it rendered the trust void for indefiniteness, because it would be incapable of enforcement through the want of specified beneficiaries who could call upon the executors for performance. There is no conversation with Mr. Ritch, appearing in the record, which compels the conclusion, in view of the action of the courts below, that any modification was made by Mr. Fayerweather. A change of intention should appear with the utmost clearness in order to destroy the legal effect of writings signed by the testator and filed for preservation. Such a change will not be sought for in a loose and general conversation, especially when it does not appear in writings upon the subject subsequently made. Some conversations were sworn to by Mr. Vaughan which would justify a finding that instructions were given making the secret trust indefinite, but they would also justify the finding that they were merely instructions for still another codicil, not drawn because death came so soon, the last having been hurriedly made to effect the main purpose, or a suggestion as to a change of existing beneficiaries, or the addition of others to be thereafter specified but not then determined upon. The presumption is that the trial court drew the latter inference; but there is a more radical answer to the claim that the secret trust was made indefinite by conversations with Mr. Vaughan, because the trial court was not bound to believe, and from the record before us is presumed not to have believed, that the alleged conversations ever took place. Mr. Vaughan, although without mercenary interest, was an interested party, under the temptation to so testify as to relieve himself from the obligation to comply with the secret trust and to justify his action in executing the deed of gift. He rested under the imputation of selfishly raising suspicions in the mind of the testator against Mr. Ritch, until he was himself made one of the legatees, when he suddenly became satisfied with Mr. Ritch's honesty and proclaimed that he was "all right." He was not entirely candid either with Mr. Ritch or Mr. Fayer-

weather.   He told Mr. Ritch on an important occasion that the testator was too ill to be seen, when that served his own purpose, although he himself saw him almost every day on business of the utmost moment, and he did not deliver Mr. Ritch's honorable and specific letter to Mr. Fayerweather, when he had impliedly undertaken to do so.   He did not produce the envelope upon which the memorandum as to " more institutions for benefit " is said to have been made, until a late day, nor did he swear, upon the trial before the surrogate, to the conversation alleged to have been had with the testator during his last hours.   He was contradicted by Miss Joyce, who denied in effect that that conversation took place, and his conduct toward that lady when he shook his fist in her face and said that he would spend the entire estate, together with his own fortune, if necessary, to succeed in the litigation then pending, shows the deep interest that he took in the will and the rights that he claimed under it.   There was not such clearness of memory, frankness of disclosure or freedom from interest as to make his testimony conclusive.   Under these circumstances the trial court was not bound by Mr. Vaughan's testimony, and the presumption is that the courts below rejected it so far. as that presumption is necessary to sustain the judgments that they rendered.

We thus have a secret trust created by the instructions of the testator, and the promise of the legatees based thereon, with definite beneficiaries, and in every respect capable of enforcement, but for the act of 1860, entitled, " An act relating to wills," which provides as follows :

" No person having a husband, wife, child or parent shall, by his or her last will and testament, devise or bequeath to any benevolent, charitable, literary, scientific, religious or missionary society, association or corporation, in trust or otherwise, more than one-half part of his or her estate after the payment of his or her debts, and such devise or bequest shall be valid to the extent of one-half and no more.   All laws and parts of laws inconsistent with this act are hereby repealed." (L. 1860, ch. 360.)   The manifest effect of this

statute was to arrest the design of Mr. Fayerweather and to prevent it from being carried into effect, at least without the consent of his widow or nieces. The legal title to the residuary gift was still in the legatees, however, for the will stood as proved, and as proved the gift was absolute in form. There was nothing in the will itself to confer an equitable title upon any one. Owing to facts outside of the will, a secret trust for the twenty colleges arose, but their equitable title was interfered with by the statute. The rights of the widow and next of kin, founded on the statute, sprang into being, and an equitable title became vested in them, so that they could call upon the residuary legatees to account for that part of the residuary estate which, by command of the law, Mr. Fayerweather could not give to literary corporations by will so long as he had a wife.

4. The effect of the releases in connection with the statute of 1860 now requires consideration.

There are authorities which hold that the rights arising from such a secret trust as we have been discussing are not testamentary in character, because the trust does not act upon the will, but on the fund after it reaches the hands of the legatees. (*Harris* v. *Horwell*, Gilb. Eq. R. 11; *Addington* v. *Cann*, 3 Atk. 141; *Rookwood's Case*, Cro. Eliz. 164; *Chester* v. *Urwick*, 23 Beav. 407; *In re Boyes*, L. R. [26 Ch. Div.] 531; *Atty.-General* v. *Cullen*, 14 Irish C. L. R. 137; *Olliffe* v. *Wells*, 130 Mass. 221; *Hoge* v. *Hoge*, 1 Watts [Pa.], 163; *In re Keleman*, 126 N. Y. 73; *Williams* v. *Fitch*, *supra*.) Founded on these authorities, the argument is made by some of the respondents that the statute does not apply to this case, because the colleges do not claim under the will, or anything found in it, but on facts wholly outside of it. They insist that the same reason that takes a secret trust away from the Statute of Wills and of Frauds takes it away from the act of 1860, and that their rights do not spring from the mode of changing title, but out of the duty of those who hold the title. They illustrate their argument by saying that if A. wills B. $10,000, and writes him a letter saying that the legacy

is in trust for C., but the letter is not delivered until after A.'s death, there is no trust; but if the letter is delivered before A. dies and B. promises to perform, there is a trust. Although the will is the same in both cases, in the one B. takes and in the other C., because the former takes from the will and the latter from the trust. The argument is not without force when applied to a trust that does not run foul of a statute. When, however, as in this case, the trust is a manifest evasion of a statute, sound public policy forbids that the testator should be permitted to effect indirectly that which he could not effect directly, at least until all intervening rights derived from the statute have been lawfully cleared away.. We think that the act of 1860 applies, but to what extent and how it was affected by the releases, we will proceed to consider.

The statute in question is not a mortmain act. The policy of the state upon that subject appears in a few general and many special statutes passed at various times. The Revised Statutes present an example of the former when they provide that "no devise to a corporation shall be valid unless such corporation be expressly authorized by its charter or by statute to take by devise." (2 R. S. 57, § 3.) The charters of various corporations illustrate the other class of legislation by limiting the amount they can take by devise or otherwise. (*Matter of McGraw,* 111 N. Y. 66, 107.) The object of all these statutes is to "prevent accumulations of property in the hands of institutions which take no part in the productive activity of the community." They act upon the power of corporations to take and hold, not on the power of a testator to give. The authorities relied upon by the appellants are to a great extent judgments pronounced when these statutes, thus expressing the policy of the state against the concentration of wealth *in mortua manu,* were under consideration by the courts. The decisions under the mortmain acts of England are equally inapplicable, when the difference between those acts and the act of 1860 is borne in mind. That statute is of a different character from any of those mentioned. It does not prevent charitable corporations from taking, but for-

bids a testator who has a wife, child or parent from giving more than one-half of his estate after the payment of his debts. (*Chamberlain* v. *Chamberlain*, 43 N. Y. 424, 440.) It does not prohibit charitable gifts altogether, but only under certain circumstances, to a certain extent and by a certain method. If the gift is not made by will, or if made by will and the testator leaves no surviving relative of the degree named, or it is to charities other than those mentioned, there is no prohibition. It does not compel a testator to leave his property or any part thereof to relatives. It does not prevent him from giving all that he has to charity during his lifetime. It is aimed simply at the giving of an undue proportion to charity by will, when certain near relations have, in the opinion of the legislature, a better claim. As was said by Judge ALLEN in *Chamberlain* v. *Chamberlain* (43 N. Y. 424–440), its object " was to prevent a person upon whom others standing in near relation had claims, from disappointing their just expectations and disinheriting them from pious or philanthropic motives, and the intent was to include all public objects, whether religious, charitable or literary." Its theory is not to keep property away from charitable corporations, but to prevent a testator from giving them more than one-half of his net estate at the expense of his wife, child or parent. Its sole purpose is to protect those natural objects of his bounty from improvident gifts to their neglect. It does not attempt to prescribe the amount or kind of property that the corporations can hold, or to place any limit upon their corporate powers. Its mandate is addressed to testators, not to corporations, which are mentioned only to partly measure the extent of the command. It points toward no public interest, but toward the prevention of what the legislature regarded as a private wrong. It was passed for the benefit of the persons named in it, not for the benefit of the people at large as a measure of state polity. Indeed the state has no policy against institutions of charity or learning. Throughout its history it has shown a deep interest in promoting such objects and in encouraging its citizens to help them. Aid to educa-

tion has always been a prominent feature in its legislation. Never has it repelled and uniformly has it invited the co-operation of individuals and corporations to that end. As was said by this court in a late case, "It is not against public policy to allow gifts to charitable, benevolent, scientific or educational institutions. The law allows and encourages such gifts and those who make them are commended as the benefactors of their race. Such institutions, dotted all over our land to succor, elevate, educate men and ameliorate their condition, are distinguishing features of our modern civilization." (*Hollis* v. *Drew Theological Seminary*, 95 N. Y. 166–172.)

We are led by this reasoning, based upon an analysis of the statute and a comparison of its provisions with those of mortmain statutes, to the conclusion, which is in substantial accord with the authorities so far as they have been called to our attention, that only the persons named in the act and those benefited through them, can invoke its protection. The state through its attorney-general cannot by legal proceedings raise the question or prevent the gift from taking effect in accordance with the wishes of the testator. The rights springing from the statute are personal, the same as the rights of a borrower under the Statute of Usury, and they can be waived or relinquished in the same way. (*Williams* v. *Tilt*, 36 N. Y. 319, 325; *Smith* v. *Marvin*, 27 N. Y. 137, 143.) While the one was passed to protect the family of the testator and the other to protect the estate of the borrower, and both prohibit certain acts, we see no reason why the benefit derived from the prohibition may not be abandoned in the one case the same as in the other. (Endlich's Interpretation of Statutes, 360.) The command that the gift shall not be "valid" is no more imperative than the declaration that the usurious security shall be "void." While it has been held that the prohibition of the statute of 1860 may be insisted upon by any person who would derive a benefit therefrom, although not one of those named therein, this simply extends the list of such as have rights to waive or retain at their election. (*Harris* v. *Am. Bible So.*, 4 Abb. Pr. [N. S.] 421.) The widow

and next of kin for whose benefit the statute, as applied to this case, was passed, could, prior to the execution of the releases by them, have asked the courts to enforce it, and award them their equitable rights against the residuary legatees as their trustees. No one else could set the courts in motion or the statute in operation. The residuary legatees could not, either in their own interest or in the interest of those to whom they had assumed to give nearly one-half of the estate left by the testator, in violation of their promise to him and the secret trust resulting therefrom. That would make the statute an aid to fraud, and would defeat both its own purpose and that of the testator. (*Ryan* v. *Dox*, 34 N. Y. 307, 312.) The donees under the deed of gift are in no better position than the donors, for they stand in the same shoes. There was nothing, therefore, to prevent the widow and next of kin from reviving the secret trust by settling with the trustees and canceling their own claims. Whether they did so or not depends upon the nature of the releases, which were of two kinds, one preliminary, the other permanent, but both having the same object. The first, after withdrawing all objections to the probate of the will, contains a covenant not to sue for a construction of the will, or to set the will aside and not to make any claim upon the residuary legatees, as such, or as executors. It also contains an agreement to " execute a general release of all claims," both to the executors and their donees, under the deed of gift, as well as to Messrs. Bulkley, Ritch and Vaughan individually.

The second, which was executed after payment of the consideration provided for by the first, runs to the persons last named, as executors, trustees, individuals, and as representatives of the donees under the deed of gift, and, after reciting that the amount paid " is in compromise and full settlement of any and all contests   *   *   *   of the will of said Daniel B. Fayerweather, or concerning his estate," each covenantor says I have " remised, released and forever discharged, and by these presents do for myself and for my heirs, administrators and executors, remise, release and forever discharge," the said

persons in their said several capacities "and also the said donees" mentioned in the deed of gift, "of and from all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, claim and demands whatsoever, in law or in equity, which against the said persons or corporations, or any of them, I ever had, or now have, or which I or my heirs, executors or administrators hereinafter shall, can or may have, for, upon or by reason of any matter, cause or thing whatsoever."

Two theories are pressed upon our attention as to the effect of these instruments. One is that they operate not only as releases, but also as transfers, and the other that they are releases pure and simple. The theory of the donees under the deed of gift that either paper is an assignment seems to be an afterthought, for it is not set up in their answers and is said not to have been suggested before either of the courts below. The answers deny the facts out of which a resulting interest for the widow and nieces arises, and the most of them allege affirmatively that "said Ritch, Bulkley and Vaughan were and are absolute devisees and legatees in their own right, as individuals, of the entire residuary estate of said Mr. Fayerweather, and could dispose of the same as they saw fit; that the deed of gift mentioned in the complaint was duly made, executed and delivered, and is a valid instrument, and in fact and in law passed to the various persons and institutions named therein all that said Bulkley, Ritch and Vaughan took as aforesaid as absolute devisees and legatees." While reviewing courts have power on appeal to so amend the pleadings as to conform to the proofs in order to affirm a judgment, no such power exists for the purpose of reversing a judgment. (*Volkening* v. *De Graaf*, 81 N. Y. 268–272.) An analysis of the instruments of release, which are quite full and formal, as releases, shows that they contain no word ordinarily used to effect an assignment or transfer. The first, which is operative without the second, contains no word that is ever used for that purpose, when the connection in which it appears is taken into account. On the other hand, its language is precisely

43

adapted to effect a settlement of the litigation pending and threatened when it was executed, by terminating the contest over the will and providing that no other contest for any purpose should be begun by those signing the paper. The situation then was that the legal title to the residuary estate was in Messrs. Bulkley, Ritch and Vaughan, and that by virtue of the secret trust and the act of 1860, the widow and next of kin had the right to call upon those gentlemen to account for the residuary estate, or, in other words, to bring a suit in equity against them as trustees *ex maleficio* for an accounting. The words used in the first paper, therefore, were fit and proper to waive and extinguish the right of the widow and next of kin to bring such a suit in equity, but were neither fit nor proper, nor can they by any reasonable construction be said to have the effect to transfer or assign anything to any one. The concluding words corroborate this theory, for they are a promise " to execute a general release of all claims " to the executors and to their donees, but not to transfer anything to either. While the word " release " is sometimes used in conveyancing to transfer a title, its general meaning is to surrender a right or to discharge a liability, and when it is used in connection with the word " claims," as it is in the paper under consideration, it never has any other meaning than that of waiver, surrender or relinquishment. No right of action can pass by a release of all causes of action.

Since the first paper was effective as a release, and as a release only, all the rights springing from it came into existence at once upon its execution and delivery, and could not be changed or cut down by any paper subsequently executed by the widow and nieces. They had extinguished their claims forever, and the agreement to execute a general release did not permit, at least as to third parties whose rights had intervened, the insertion of words therein changing, or purporting to change, the effect of the first instrument, and we do not think that any attempt was made to do so. The second paper was " in compromise and full settlement " of all contests connected with the will or concerning the estate. That was the

object of the paper as stated in connection with the considera-
tion, which was not meritorious as to the donees under the
deed of gift, but was furnished, indirectly, by the ninth article
colleges.    In order to effect this object the releasors " remised,
released and forever discharged " the persons and corporations
named.    But what do they remise, release and discharge them
from, for they do not remise or release any property " to "
any one, as is usual when a transfer is made?    The answer is
found in these words of the instrument, viz. : " Of and from
all and all manner of action and actions, cause and causes of
action, suits, debts, dues, sums of money, claims and demands
whatsoever in law or in equity," &c.    So far as the intention
of the parties to these writings is a question of fact, or is at
all dependent on extrinsic facts subject to opposing inferences,
it is presumed to have been found in favor of the respondents.
Do the parties to a full and formal instrument intend to
assign when they use no word importing an assignment?    Is
it probable that there was an intention to assign anything
to the same persons in four different capacities, as individ-
uals, executors, trustees and as representatives of the donees?
How could such an assignment be enforced?    A release, how-
ever, to them in all those capacities was precisely what they
needed in order to be fully protected.    " In a struggle between
the heir or trustees whom the testator obviously did not intend
to benefit, and a charity which he confessedly designed to
endow, a court of equity will lend its aid to the extent of its
legitimate power to uphold the devise and to effectuate the
laudable and meritorious purpose of the testator."    (*M'Cartee*
v. *Orphan Asylum So.*, 9 Cow. 437–442.)    We think that
both of these papers were intended by the parties thereto, at
the time of their execution, as releases of claims in the ordi-
nary sense of those words, and not in any sense as assignments
or transfers.    (*Colton* v. *Field*, 131 Ill. 398 ; *Crum* v. *Sawyer*,
132 Ill. 443.)

But, aside from these considerations, and upon the assump-
tion that the releases operate as transfers, how does the matter
stand ?    Messrs. Bulkley, Ritch and Vaughan were trustees in

two capacities with reference to the same fund, one, however, subordinate to the other.    They were trustees, as we have seen, for the benefit of the ninth article colleges under the secret trust; and, owing to the statute of 1860, they were also trustees for the widow and next of kin, and the latter trust was paramount to the former.    If, therefore, these gentlemen bought the rights of the widow and next of kin, for whose benefit did they take them?    Not for their own, nor for the benefit of their donees, who stood in no better position, but for the benefit of the twenty colleges. (*Torrey* v. *Bank of Orleans*, 9 Paige, 649; *Fulton* v. *Whitney*, 66 N. Y. 548.)    Under no circumstances is a trustee allowed to set up a title adverse to his *cestui que trust*.    (Perry on Trusts, § 433; Lewin on Trusts, p. 285.)    The paramount trust having been bought in by the trustees, the other trust then became effective.    Unless this position is true, a trustee may purchase outstanding titles against his trust estate, for his own benefit, and to the injury of the *cestui que trust*, and thus speculate with the subject of his trust.

We are of the opinion, therefore, that, whether the residuary legatees, by the releases, extinguished or acquired the rights of the widow and next of kin, the result is the same. Upon either theory the widow and nieces had placed themselves in such a position, by their instruments of release, perhaps, without foreseeing all the consequences, that they could not demand of the residuary legatees, as trustees, their equitable rights, and, therefore, the statute of 1860 at once ceased to apply. (*Harbeck* v. *Pupin*, 145 N. Y. 70, 77.)    It became as inoperative as if the widow had died before the testator.    All persons for whose benefit the statute was passed having waived their rights, the result was the same as if it had never had an existence.    The donees under the deed of gift had no greater rights than they would have had if there had been no widow to set the statute in motion.    As the statutory claim of the widow and next of kin was all that could lawfully prevent the execution of the secret trust, when they voluntarily abandoned that claim, it became the duty of the

residuary legatees, as trustees, to carry out the testator's instructions in accordance with the promise made to him. Whatever interest they acquired by virtue of the releases inured to the benefit of the respondents, who thus stand before the court entitled to the fund in controversy, unless they are estopped in equity, by their conduct, or at law, by a judgment, from asserting the claim presented.

5. The claim that there is an equitable estoppel rests mainly upon the allegation that the respondents kept silent concerning their intentions while promoting and aiding the settlement with the widow and next of kin. So far as this depends upon a question of fact, the final decision has already passed against the appellants by the united action of the courts below. The ninth article colleges had no connection with the making of the deed of gift or the instruments of March 5th, 1891. After these agreements of settlement had been executed the consent of those colleges was asked, not to the settlement, but to postpone the payment of their specific legacies " to the payment of the amount " that the widow and next of kin had agreed to accept. This is all they were asked to consent to and all that they did consent to, as a careful reading of the instrument signed by them will show. They did not abandon any claim that they might make against the estate other than as thus specified. The effect was simply that the respondents could not claim that the executors wrongfully paid out the $310,000, and we see no other element of estoppel against them arising from the facts. The claim of the residuary legatees that, owing to the instrument of " consent," they have paid a large proportion of the specific legacies to the twenty colleges, has no bearing, because they could not make a commercial use of the discretion confided to them by the ninth article of the will with reference to paying or withholding the specific legacies therein given. They were bound to exercise that discretion according to their honest judgment and not to make it the subject of barter. No payment was made to the respondents except such as it is conceded they were entitled to receive. Moreover, it is unreasonable to believe that they were consenting to surrender

and abandon $305,000, being the difference between $2,195,000, the aggregate amount of the specific legacies to colleges and hospitals, and $2,500,000, being one-half of the conceded value of the estate at the time of the testator's death. When the paper signed by them is considered in the light of such facts only as, according to the decisions of the courts below, they are presumed to have known at the time, we think that it should be construed as a consent to the payment of the money and not to the settlement as such.

6. The only point remaining that requires the expression of consideration is whether the adjudication by the surrogate in proceedings under the Collateral Inheritance Act is a bar to this action.

An appraiser was appointed who, after giving notice to all parties interested, reported, among other things, that he was "not satisfied from the evidence submitted to report in favor of the claim that decedent's residuary property is charged with a trust in favor of Hamilton College and other corporations," and he, therefore, concluded that the property passed as provided by the will and codicils as proved. Upon this report an order was made by the surrogate that the testator bequeathed the sum of $717,398.69 to each of the three residuary legatees.

This was a special proceeding instituted by the comptroller of the city and county of New York with the sole object of ascertaining what amount of property, passing under Mr. Fayerweather's will, was subject to taxation and to fix the amount of the tax. The decree of the surrogate should be construed solely with reference to that object and, as thus construed, the adjudication was that, for the purposes of taxation under the act in question, a certain amount of property passed to the residuary legatees under the will. Legitimate inquiry necessarily stopped at that point, for it was immaterial, so far as that statute was concerned, whether the fund became impressed with a trust after it reached the residuary legatees, as the tax would be the same whether it did or not. They took the legal title, as we have held, and hence their legacy

was subject to taxation without reference to what it became their duty to do with it. The adjudication was necessarily limited to the subject of taxation, and if conclusive at all as a bar, it was not conclusive upon the rights of the parties arising from matters outside of the will. The surrogate was acting simply as an assessing and taxing officer, and represented the state for those purposes. (*Matter of Wolfe*, 137 N. Y. 205, 211.) As was said by this court in *The Matter of Ullmann* (137 N. Y. 403, 407) : " Every officer charged with the duty of executing the taxing power, whether it be a surrogate or a town assessor, must necessarily decide, in a judicial capacity, important questions of law in order to perform the duties of his office. Ordinarily, such decisions do not, like judgments in actions, conclude the parties as to the same question in subsequent proceedings instituted for some other purpose, although in all such proceedings for the assessment of the tax it ought to, and, doubtless, would, until reversed and set aside." We think this foreshadowed the correct rule, and that the adjudication of the surrogate was binding upon the question of taxation only.

We thus reach the final conclusion that all obstacles to the enforcement of the secret trust were lawfully removed, and that it is the duty of the courts to give full effect to that trust in accordance with the intention of the testator and the promise of his residuary legatees. In announcing this result, which is the nearest approach to justice that we are able to make, it is a satisfaction to believe that the vast fortune involved will be distributed in accordance with the controlling thought and noble purpose of the man who made it.

The judgment should be affirmed, with costs to all parties appearing by separate attorneys payable out of the estate.

ANDREWS, Ch. J. (dissenting). I deem it proper to state the reasons for my dissent from the conclusion reached by the majority of the court.

The testator, by the ninth clause of his will, bequeathed to twenty colleges therein named legacies to a large amount,

aggregating approximately a sum equal to one-half of his estate as it existed at the time of his death, on the 15th day of November, 1890. By the tenth clause he gave to his executors all the rest and residue of his estate in trust, to convert the same into money and to divide the same equally between the same twenty colleges named in the ninth clause. If the will had remained unchanged it is clear that, under the statute of 1860, the gifts to the twenty colleges by the ninth and tenth clauses would have been ineffective and void so far as they exceeded one-half of the testator's estate. The testator left a wife surviving him, and the statute prohibits a devise or bequest by a testatator having a husband, wife, child or parent, to any corporation of the classes therein enumerated, of more than one-half of his estate, and where such devise or bequest exceeding one-half of the estate shall have been made, the statute declares that "such devise or bequest shall be valid to the extent of one-half and no more." The statute is aimed at and takes away the power of a testator in the respect mentioned. In *Chamberlain* v. *Chamberlain* (43 N. Y. 424) Judge ALLEN, referring to the statute of 1860, says: "The prohibition operates upon the testator's capacity to give, rather than upon the power of the legatees to take," and RAPALLO, J., in *Stephenson* v. *Short* (92 N. Y. 433), referring to the cognate section in the act of 1848, says: "The second (section) restricts the power of a testator to devise or bequeath to such corporation in certain cases, and prohibits a testator who leaves a wife, child or parent from devising or bequeathing to such corporation more than one-fourth of his estate." In the earlier case of *Bascom* v. *Albertson* (34 N. Y. 584) the court, referring to the act of 1860, although the construction of the act was not then in question, said: "It was designed to regulate and restrict the power of testators." There are other authorities in the state to the same purport, but it is unnecessary to cite them, because there can be no doubt upon the plain language of the statute that it was intended to limit the power of testators and invalidate any testamentary disposition to corporations mentioned

in the act, in excess of one-half of testator's estate, but
sustaining it up to that point. The language "shall be
valid to the extent of one-half and no more," is too plain
for argument or construction. I deem it important, in
view of the interpretation placed on the codicils and the
releases of the widow and next of kin, to proceed some-
what further upon the assumption that the original will
had remained unaltered, and to consider what would have
been their rights if the testator had died without having
changed the original will. I can entertain no doubt that in
that event the portion of the estate beyond the one-half part,
to which the twenty colleges would be entitled under the ninth
and tenth clauses of the will, would, although given by the
will to the twenty colleges, nevertheless go to the widow and
next of kin, and descend and be distributable under the Stat-
ute of Descents or Distributions, as in case of intestacy. No
other conclusion is possible. The devise or bequest to the
twenty colleges was invalid as to the excess, for so the statute
declares. It could not go to the residuary legatees, because
they took in trust for the corporations. The intention of the
testator could not be enforced, because the disposition he
attempted to make was illegal. The corporations could not
stand upon the devise and bequest in their favor, because the
statute which prohibited the gift necessarily precluded them
from insisting upon the validity of the disposition. In all
cases, upon the death of the owner of property, the title
devolves upon some one, either under his will or upon
his heirs or next of kin, or escheats to the state. If
he undertakes by will to dispose of his property in
a mode or for purposes which the law prohibits, the
attempted disposition is void, and in the absence of any
alternative valid disposition by the will, it goes to his
heirs and next of kin by operation of law. For no
moment of time is the title suspended. In the case just sup-
posed the rights of the heirs and next of kin attach immedi-
ately upon the death of the testator, and the will at most
is a mere cloud upon their title. Their right would vest

immediately without the intervention of any court, and an appeal to the court would be necessary only to put them in possession of their right in case it was denied or withheld. If any authority is needed to establish the proposition that a devise or bequest, made in contravention of the statute of 1860, is void, and that the part of the estate devised to charity, in excess of the one-half part thereof, devolves upon the heirs and next of kin as in case of intestacy, in the absence of any valid alternative disposition, the case of *Chamberlain* v. *Chamberlain* is decisive. There the residuary estate, comprising more than one-half of the testator's estate, was devised and bequeathed, after the enactment of the statute, to two corporations within the act, and it was adjudged by the judgment, entered in the Supreme Court and in this court, that the gift, in excess of the one-half part of the estate given by the will to the two corporations, devolved upon the heirs and next of kin. The testator when he made the will was under no misconception as to the invalidity of the will under the act of 1860, so far as it gave to the twenty colleges more than one-half of his estate, nor as to the resulting rights of his heirs and next of kin. He was fully apprised by counsel of the restriction in the law of 1860, and in the memorandum which he delivered with the will to one of his executors, he recognized that his purpose to give the bulk of his estate to the twenty colleges could not be effectual, except through the forbearance and acquiescence of his heirs after his death. But after the execution of his will he came to appreciate the danger that his purpose might be defeated by the refusal of his heirs to consent to forego their rights or to waive any objection under the statute of 1860. This led to the execution of the codicil, by which he revoked the tenth clause of his will, substituting therefor a new residuary clause whereby he constituted Bulkley, Ritch and Vaughan his residuary legatees and devised and bequeathed to "them and their heirs forever" his whole residuary estate, in form an absolute gift, subject on its face to no trust or condition whatever. It is out of the secret understanding found to have existed between the testator and

the residuary legatees in respect to the disposition to be made of the residue that one of the most important questions in the case arises. It was found by the trial court that Bulkley, Ritch and Vaughan were made residuary legatees under the codicil by reason of the promise of Ritch and Vaughan, made to the testator, for themselves and on the part of Bulkley, that they would sell and convert the residuary estate into money and divide the same equally, share and share alike, among the twenty colleges mentioned in the ninth clause of the will. That this was the general purpose of Fayerweather in making this disposition is rendered clear by the memorandum of Dec. 11, 1884, deposited with Ritch, in which the testator declares that he had made Messrs. Ritch and Bulkley his residuary legatees, " in the confidence that thereby my intentions *as expressed in my will* shall be carried into effect." By a codicil subsequent to the date of this memorandum Vaughan was joined as legatee with Bulkley and Ritch.

I assume that the finding of the trial court, heretofore stated, is supported by evidence. The judgment in this case awards to the twenty colleges named in the ninth clause of the will the whole of the residuary estate remaining in the hands of Bulkley, Ritch and Vaughan, who were executors of the will as well as residuary legatees. Independently of other grounds urged in support of the judgment, it is claimed that the promise of the residuary legatees, which was the inducement operating upon the mind of the testator to make the residuary gift, is enforceable in a court of equity as an equitable obligation binding in conscience, and which the legatees were bound to perform. The law, it is insisted, raises out of the transaction a trust in favor of the real objects of the testator's bounty, which a court of equity proceeding upon its established principles will compel the legatees to observe and perform. If the correctness of the judgment below turned upon the question who were the parties intended by the testator to be benefited, and what colleges or institutions he intended should receive the residuary fund, I should have little hesitation in reaching the conclusion

that they were the twenty colleges mentioned in the ninth
clause of the will, and that a distribution made under the so-
called deed of gift, or a devolution of the residue upon his
heirs or next of kin, would disappoint his expectations in mak-
ing the codicil.   But this is to be said of every case where the
disposition made by a will fails from some inherent defect in
the disposition itself.   "It is not sufficient," says the chancel-
lor in *Haxtun* v. *Corse* (2 Barb. Ch. 521), " to deprive an heir
at law or distributee of what comes to him by operation of
law, as property not effectually disposed of by will, that the
testator should have signified his intention by his will, that his
heir or distributee should not inherit any part of his estate.
But to deprive an heir or distributee of his share of the prop-
erty which the law gives him, in case of intestacy, the testator
must make a valid and effectual disposition thereof to some
other person."   The cases are numerous in which courts of
equity have fastened constructive trusts upon the legal
title to real or personal property in the hands of nominal
owners in favor of persons to whom the owner owes an
equitable duty in respect of the property in his hands,
inconsistent with his retention of an absolute title.   The
foundation of this jurisdiction is in every case the inca-
pacity of courts of law to give any or to give adequate
relief, and from its very nature can never be invoked except
for the promotion of justice and the prevention of fraud.
The trust may be raised from circumstances, but for these
purposes and for no others.   It would be a solecism for a
court of equity to imply an equitable obligation to do that
which its own principles condemn, or to enforce an express
trust in contravention of the law.   The beneficent jurisdiction
of courts of equity to raise and enforce constructive trusts
has no more signal illustration than in cases of devises or
bequests procured to be made, absolute in form, upon the
promise of the devisee or legatee to make some provision out
of the property devised or bequeathed for some other person
or object, or to appropriate it in a particular way, and where
it may be gathered that, except for the promise, the devise or

bequest would not have been made.  In such a case, the courts enforce the promise to prevent a double fraud, a fraud upon the testator and a fraud upon the person for whose benefit the promise was made.  It is unnecessary to cite the cases which support this equitable principle.  The subject is treated at length in the very able opinion of Judge FINCH in the case of *O'Hara* v. *Dudley* (95 N. Y. 403), and no other authority need be cited.  But the principle, however broadly stated, must, from the nature of the case and the constitution of the court called upon to apply it, be always subject to the limitation that the promise must be to do a lawful and not an unlawful thing.

The purpose to which the devisee or legatee undertakes to apply the money must be lawful, and although the purpose may be lawful, the promise may be illegal by reason of some prohibition of law disabling the testator from making a posthumous gift to the beneficiary under the circumstances or in the mode adopted.  In either case, I conceive a court of equity cannot and will not imply a trust against the devisee or legatee for the purpose of enforcing the promise.  The case of *O'Hara* v. *Dudley* is a direct authority on the first proposition in the preceding paragraph, and the cases under the act 9 Geo. II, chap. 36, improperly called a mortmain act, cited in Judge FINCH's opinion, sustain, I think, the second proposition.  In the case of *O'Hara* v. *Dudley* and in the English cases under the act of Geo. II, the courts refused to sustain a trust for the purposes intended by the parties, but adjudged that there was a resulting trust in favor of the heirs and next of kin of the testator in the property held by the devisee or legatee under a gift absolute in form.

I have no doubt that under the facts found a court of equity, proceeding according to its settled principles, would raise a constructive trust as against the residuary legatee in favor of the twenty colleges.  But this, subject to the necessary limitation that the trust so constituted was lawful.  If it was unlawful under the act of 1860, and if performance would violate that statute, then clearly a court of equity

would not raise a trust in order to give effect to the proposed illegal disposition. I am of opinion that the arrangement between the testator and the residuary legatee was in contravention of that statute. It is not denied that if the constructive trust sought to be raised in favor of the twenty colleges had been written out on the face of the will, the trust would be void under the statute. The statute prohibits a devise or bequest contrary to its provisions, "in trust or. otherwise," a prohibition of the broadest and most sweeping character. But the claim is that the twenty colleges to whom the residuary estate has been awarded do not take under the will or under any devise in the will, or through any testamentary act, but outside of and independently of the will, through and by virtue of the conscientious obligation created by transactions *de hors* the will, and that the case is not, therefore, within the statute. The same result concededly is attained as though the trust was written in the will, but this it is claimed is no objection to its enforcement, because a trust outside of the will arising by construction is not prohibited, and although the scheme adopted by the testator and assented to by the residuary legatees was for the purpose of evading the law, an evasion of a statute is not, or may not be a violation of the statute evaded.

I do not adopt the radical view of one of the learned counsel for the appellants, that a court of equity will not raise a constructive trust in favor of the twenty colleges, and will not lend its aid to enforce a transaction in evasion of the statute of 1860, although the transaction is not prohibited thereby. The residuary legatees concededly upon the facts found are not entitled to retain the property for their own benefit, and the heirs and next of kin have no title if it was legally disposed of by the will, and the secret trust was not illegal. It would not be unconscientious for the court to award the fund to the institutions for whose benefit it was really given, on the mere ground that the testator intended to circumvent the law, provided the method he adopted was not a violation of the statute, although it tended to thwart its general policy. But, as I

have intimated, the arrangement between the testator and the residuary legatee was prohibited by the statute of 1860. That statute was not prompted by any hostility to charities or to religious or educational institutions. It did not restrict gifts *inter vivos* to the corporations mentioned, however large, even to the whole of the donor's property, and the only restriction upon such gifts would arise out of the incapacity of the donee to take under its charter. What the statute plainly did intend was to prohibit one form of donation to corporations described in the act, which should exceed one-half of the donor's estate, namely, a donation by will. The donor was not permitted by will to give to the charities mentioned beyond the prescribed amount. The statute regulated and restricted testamentary donations, and no others. It is to be observed also that all corporations are not included. The testator might have given by will all his property to corporations not of the class enumerated, and their capacity to take would be the only question. Nor is a testator prohibited from giving all his property by will to the corporations mentioned in the act, when he leaves no wife, children or parent surviving. The corporations enumerated in the statute were those to which, in the last days of life, a man, acting under mistaken notions of duty, might voluntarily or through persuasion be induced to give his property in disregard of the just claims of kindred. The felicitous language of COMSTOCK, Ch. J., in *Downing* v. *Marshall* (23 N. Y. 366), frequently quoted, used in considering the general policy of the restriction upon devises to corporations contained in the general statute, is peculiarly applicable here. Speaking of the policy and necessity of the restriction in the Revised Statutes, he says: "Nor is this necessity by any means a fanciful one. It is eminently praiseworthy to give in the interest of charity and religion. But in the last hours of life exaggerated impressions of charitable or religious duty often obscure the judgments of men, and subject them to undue influence and persuasion. Against these the statute is intended to guard, because it is in behalf of associations incorporated for pious

and benevolent purposes, that the sentiments of men in such situations are most generally appealed to. The enactment is, therefore, prohibitory, and it ought to be expounded and applied in that sense."

The English statute of Geo. II, before referred to, although more radical than the statute of 1860, is founded on the same policy. It prohibits all devises of lands, or of funds to be laid out in lands, to charities, but it does not prevent the owner of property, in his lifetime, to convey to charities all his property by deed, affixing only the restriction that it shall have been executed twelve months before his death and enrolled at least six months prior to that event, restrictions intended manifestly to prevent even this method of gift when made in prospect of or under the shadow of impending death. The court is asked to hold in this case that a scheme contrived by the testator and his residuary legatees for the purpose of circumventing the statute of 1860, and to make a posthumous gift of a very large estate to corporations, to whom the testator could not give it directly by will, through the device of a constructive trust, is not in contravention of the statute of 1860. I cannot assent to this proposition. It has, in my judgment, neither reason nor authority in its favor. The language of Lord ELDON, in *Stickland* v. *Aldridge* (9 Ves. 516), is applicable to this case. " It would," he said, " be a strong proposition that the providence of the legislature, having attempted expressly to prevent a disposition of land for purposes of this sort, was so short as to be baffled by such a transaction as is stated by this bill." The attempt here is to separate the strictly testamentary act from the secret arrangement, and to refer the right of the twenty colleges exclusively to the latter. But the will is a necessary and indispensable element in establishing the alleged trust. The testamentary gift and the secret arrangement are inseparably conjoined. The plaintiffs cannot proceed a step without showing the will and the testamentary gift. It is only by attaching to this the promise of the residuary legatees that it can be pretended that any trust in their favor arises. The Statute of Wills, which

requires wills to be in writing, was an obstacle to be overcome when originally the attempt was made to establish a parol trust in contradiction of the testamentary instrument. But the court solved the difficulty by treating the two transactions as separate. The will, it was said, was not changed, but the right might be grafted on to the parol promise, and so technically the devise was not changed. But this subtle distinction was sustained for the purpose of preventing fraud and never to overreach or subvert the law. In numerous cases under the statute of Geo. II, the English courts have held that a secret trust for charity, engrafted on a devise absolute in form, was void. It is said that these cases are sustainable on the broad words of the statute. But the English statute is, I think, no broader than the statute of 1860. This statute prohibits all bequests or devises to corporations named therein beyond the permitted amount, " in trust or otherwise," that is, as I construe it, " in trust for the corporation or in any other manner," and it would, I think, be a narrow and misleading view to hold that it does not prohibit the device resorted to in the case before us.

If I am right up to this point, it necessarily follows that immediately on the death of the testator, a resulting trust in the residue of the estate sprang into existence in favor of the widow and next of kin, which the court would transform into a legal estate by compelling a transfer by the residuary legatees to them of the legal title. They could not under the findings retain the property for their own benefit; the twenty colleges could not enforce the illegal trust attempted to be created in their favor, and the only other alternative was a resulting trust in favor of the widow and next of kin. This trust *eo instanti* on the death of the testator displaced the unlawful trust attempted to be created in favor of the twenty colleges. It was, therefore, essential to support a claim by the twenty colleges to the fund that they should be able to show a right thereto derived from the widow and next of kin. They were the equitable beneficial owners, and their interest under well-settled rules prevailing in this state was assignable. They, as

owners, could transfer their rights and interests to the twenty colleges, or to any other persons or corporations by an act *inter vivos.* It would be a transfer of their own property, not within the act of 1860. But it would not be enough to establish the title of the twenty colleges for them to show that the widow and next of kin had divested themselves of their interest. It must appear that it had been acquired by the twenty colleges, or that an assignment was made to some other person or persons, which by the terms of the assignment or by operation of law inured to their benefit. I repeat, the attempted trust in favor of the twenty colleges being void, and the resulting trust in favor of the widow and next of kin attaching to the fund, no title thereto can be asserted by any person or corporation, except a title derived from or under the widow and next of kin. The learned counsel for the twenty colleges, appreciating the stress of this view, seeks to sustain their title by the claim that the residuary fund was vested in them by force of the instruments called releases executed by the widow and next of kin, bearing date March 5th, 1891, and June 12th, 1891. These instruments it is insisted extinguished all claim of the widow and next of kin in the fund now in question, and their claim being out of the way, the residuary legatees held the fund subject to the original trust, freed from any infirmity, by reason of the act of 1860. The construction sought to be placed on the instruments of release by the learned counsel for the twenty colleges, namely, that they operated merely as a surrender to the residuary legatees and an extinguishment of the rights and claims of the widow and next of kin to the residuary estate, is, in my judgment, wholly inadmissible. This construction ignores the evident intention of the parties to the instruments, and contradicts their plain language and meaning, when read in the light of the surrounding circumstances. The so-called deed of gift to the twenty or more colleges and institutions, executed by the residuary legatees February 24th, 1891, purported to give the residuary fund to the beneficiaries therein named, with a reservation to Bulkley, Ritch and Vaughan of the right out of

the fund to make additional provision for the widow and next of kin beyond that contained in the will. On the 5th of March, 1891, while the contest as to the probate of the codicils was pending, two instruments were executed, one by Bulkley, Ritch and Vaughan to the widow and next of kin, which referred to the deed of gift of the 24th day of February, 1891, and the reservation therein, whereby they added to the annuity to the widow the sum of $10,000 beyond that given her by the will, and gave to the widow and next of kin, out of the residuary estate, further sums aggregating $310,000. The other instrument was the so-called first deed of release, in which the widow and next of kin, " in consideration of the instrument of even date herewith " (above referred to), bound themselves to make no claim upon Messrs. Bulkley, Ritch and Vaughan, other than for the " amounts left us by the will and codicils, and the deed of gift executed by the said Bulkley, Ritch and Vaughan on the 24th day of February, 1891, and the instrument dated on the 5th day of March, 1891," and they further bound themselves upon payment to them respectively of the several amounts mentioned in " said deed of gift and said instruments, to severally execute a general release of all claims, except those arising under the will and codicils, both to the executors and to the donees mentioned in the deed of gift dated on the 24th day of February, 1891, and to said Bulkley, Ritch and Vaughan individually."

On the 12th day of June, 1891, the widow and next of kin severally executed the formal deeds of release provided for in their deed of March 5th, 1891. The release of Mrs. Fayerweather first acknowledges the receipt of the two hundred and twenty-five thousand dollars, to which she was entitled under the instrument executed by Bulkley, Ritch and Vaughan March 5th, 1891. The language is: " For and in consideration of the sum of two hundred and twenty-five thousand dollars, lawful money of the United States, to me in hand paid by Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, as executors and trustees under the last will and testament of Daniel B. Fayerweather, deceased, and individu-

ally and as the representatives of the persons and corporations hereinafter named, forming a class known as donees under the deed of gift executed by the said Bulkley, Ritch and Vaughan on February 24, 1891." She next acknowledges that sum to be " in compromise and full settlement of any and all contests on my part of the will of said Daniel B. Fayerweather, deceased, or concerning his estate." Following the statement of the consideration and that the sum received was in full compromise and settlement, are the operative words of the instrument, namely : " Have remised, released and forever discharged, and by these presents do for myself and for my heirs, administrators and executors, remise, release and forever discharge the said Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan, as executors and trustees aforesaid, as individuals and as representatives of the said donees constituting a class, and also the said donees, to wit, the persons and corporations mentioned in a certain deed of gift duly delivered, made by Justus L. Bulkley, Thomas G. Ritch and Henry B. Vaughan on the 24th day of February, 1891, which deed of gift was introduced in evidence in the probate proceedings of the last will and testament of Daniel B. Fayerweather, deceased (and marked Exhibit No. 7, contestants), and which said deed of gift is hereby made a part of this release, in order that the persons constituting said class of donees, and to whom this release runs, may be more fully known, and also the legal successors, assigns, heirs, executors and administrators of all the aforesaid persons and corporations, *of and from* all and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, claims and demands whatsoever, in law or in equity," etc., concluding by an exception of her claim for the annuity mentioned in the agreement of March 5th, 1891, " made pursuant to the deed of gift above referred to." The releases by the next of kin were of the same purport.

It seems impossible to read these releases in view of the circumstances which led to their execution, without being

forced to the conclusion that they were executed with the intention and for the sole purpose of giving effect to and confirming the deed of gift of February 24th, 1891. They acknowledge the receipt of the consideration from Bulkley, Ritch and Vaughan, as representatives of the donees under the deed of gift. They "remise and release" to the donees under the deed of gift, and to Messrs. Bulkley, Ritch and Vaughan, "as representatives of said donees." They annex the deed of gift to the release in order that the persons "to whom the release runs" may be identified. · This transaction, if it has any meaning, was to make good the deed of gift, which, without the confirmation of the widow and next of kin, would be ineffectual, and give no title to the donees. The absence of specific words of transfer or sale is of little moment if the intention is plain. The intention is the cardinal fact in the construction of written instruments. Where the words permit an instrument to operate in either of two ways it is effective for the way at which the intention points, when that can be ascertained by reading the instrument in the light of the surrounding facts. In former times certain technical words were essential in deeds of realty. Here the property was mainly personal, and in respect to the creation of interest in personal property formal words are not important, if the substance of the transaction intended can be ascertained. Unless the releases operate as confirmation of the deed of gift it has no operation whatever as to the donees, "to whom this release runs." The release, for greater precaution, extended to the executors in their official character, and to them as individuals, but this accentuates the fact that the paramount purpose was to ratify and confirm the deed of gift. And, finally, on this point, whatever may be said as to the release operating as a transfer to the donees in the deed of gift, there can be no pretense that the widow and next of kin intended to transfer their interest in the estate to the twenty colleges. They are not in any way referred to in the written instruments, and it is difficult to perceive how a transaction can inure to their benefit contrary to the intention

of the parties, and which would give it the practical effect of rehabilitating the illegal trust.

It is said that the statute of 1860 was intended for the benefit of a wife, husband, child or parent, and that, if they do not raise the question, the validity of a will under that statute cannot be questioned by other parties. In my view that inquiry is not pertinent under the facts in this case. The widow has raised the question in the most emphatic way by transferring her interest in the estate to the donees under the deed of gift. But I am of opinion that any person who would take an interest in the property of a decedent, under the Statutes of Descent or Distribution, in case of intestacy, may raise the question under the statute of 1860, although not holding the relationship mentioned in the statute, provided he would be entitled, if the statute had been violated, to a share in the excess willed to the corporations, and that he would not be bound by the consent of other parties to the disposition. The cases of *Harris* v. *American Bible Society* (2 Abb. Ct. App. Dec. 316), and of *Chamberlain* v. *Chamberlain* (43 N. Y. 434), seem to be direct authorities upon this point. In both the testator left a widow, and no child or parent, and bequeathed more than half his property to corporations by wills taking effect after the passage of the act of 1860. In the one case the widow consented to the invalid disposition, and in the other, by her election to take a provision in lieu of dower, she was held to be barred from claiming any other interest. In both cases the objection interposed by next of kin, remote relations of the testator, was sustained.

There are other points urged by the counsel for the appellants which are not free from difficulty, but I will not consider them. I think the judgments below are erroneous, and that the donees under the deed of gift are entitled to the fund.

All concur with VANN, J., for affirmance, except ANDREWS, Ch. J., who reads for reversal.

Judgment affirmed.